**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAI SAI BABA LLC, JENNA LODGING LLC, Q HOTELS LLC, HOT SPRINGS HOST INC., RADHE RADHE CORPORATION, DAHYA INVESTMENTS INC., MS INVESTMENTS, INC., LAXMIKRUPA CORPORATION, KRISHNA HOSPITALITY LLC, LABURNUM HOSPITALITY LLC, VEER HOTELS INC., DEERFIELD HOTEL TWO LLC, SAI RAM KRUPA LLC, AKSHAR MOTEL LLC, MARS HOTEL LLC, YASHMIRA LLC, SUN MOTEL LLC, OAK HILL HOTELS LLC, SRO HOTEL LLC, HANU LLC, SHREE JAY GANESH LLC , SAI KRISH HOSPITALITY LLC, TUNDAVIA HOSPITALITY LLC, JAYDEN HOSPITALITY LLC, PINEVILLE HOSPITALITY LLC, TUNDAVIA INVESTMENTS LLC, BIJ HOTEL, LLC, AUM INVESTMENTS LLC, VICTOR HOSPITALITY LLC, SHUBHAM LLC, NEWLIGHT INC., JESSUP QI LLC, MIDDLEBOROUGH HOSPITALITY LLC, CATON HOSPITALITY LLC, BELMONT HOSPITALITY LLC, ELKRIDGE HOSPITALITY LLC, JAI SWAMINARAYAN CHESTERTOWN LLC, MAHAMATI INC, DC HOTELS LLC, SOUTHAVEN HOTELS LLC, A1 GROUP LLC, ALBEMARLE HOSPITALITY LLC, HELI HOSPITALITY, LLC,  SHIVA HOSPITALITY GROUP LLC, DEEPAK LLC, KRISHIV HOSPITALITY LLC, OUTERBANK HOTEL LLC, A&A HOSPITALITY INC., PREMIER HOSPITALITY LLC, HAVELOCK HOSPITALITY, LLC, HIGHMARK LODGING LLC, ELITE HOSPITALITY LLC, SUNBURST HOTELS, LLC, ATMIYATA HOTELS LLP, MUHLENBERG MOTEL CORPORATION, AHKH LLC, MYGHM COOKSTOWN LLC, JSK MIDDLETOWN LLC, WEST WINDSOR LODGING, LLC, JAI SWAMINARAYAN GLOUCESTER LLC, DIP HOSPITALITY LLC, HARTWICK HOTEL COMPANY LLC, SYRACUSE HOTEL PARTNERS LLC, AKASH HOTELS LLC, READING HOTELS LLC, SHREE | CIVIL ACTION No. 5:20-cv-02823<br><br>JURY TRIAL DEMANDED |

JAY BHOLE INC, JSK POTTSTOWN LLC, SAI
RAM HOTELIERS LLC, TRIMIL COLUMBIA
LLC, GETTYSBURG HOTELS LLC, JSK NEW
HOPE LLC, SHREE RAM KRUPA LODGING
GROUP INC., FAIRMOUNT HOSPITALITY LLC,
RRR HOTEL LLC, AVIS HOSPITALITY,
ANNPURNA SC LLC, OM COMPANY, SAVAN
LLC, AJK HOSPITALITY LLC, MEGH VARSHA
INC.,  SHRI GANPATA ENTERPRISES. LLC,
JAY GURUDEV LP, SAVNI INC, KING RANCH
INVESTMENTS, LLC, OUMSHIVA LLC,  9M9
HOSPITALITY INC., AATMA LLC, JAI MAA
UNIVERSAL, LLC, DIGAMBARA LLC, SAGAR
ENT INC. VAB 435 OCEANFRONT LLC, and
BAPUP INC.

PLAINTIFFS,

V.

CHOICE HOTELS INTERNATIONAL, INC.  and
CHOICE HOTELS OWNERS COUNCIL,

DEFENDANTS.

## FIRST AMENDED COMPLAINT

## INTRODUCTION

1.      Choice Hotel International, Inc.'s ("Choice") has and continues to engage in

unconscionable, fraudulent, unlawful, and anticompetitive business practices in connection with

the operation of its hotel franchise system.

2.      This action seeks an accounting along with monetary, declaratory and injunctive

relief for violations of the Racketeer Influenced and Corrupt Practices Act ("RICO"), 18 U.S.C.

§ 1962(c); the Sherman Act, 15 U.S.C. § 1; the Civil Rights Act, 42 U.S.C. § 1981; various state

franchise acts; common law fraud; and breach of contract, including the implied covenant of

good faith and fair dealing.

3.     Choice is a hotel franchisor that owns several well-known national hotel brands, including Comfort Inn, Comfort Suites, Quality Inn, Sleep Inn, Clarion, Cambria Suites, MainStay Suites, Suburban Extended Stay Hotels, EconoLodge, Rodeway Inn, and Ascend Hotel Collection.

4.     Globally, there are over seven-thousand hotels operating under Choice brand marks.

5.     Plaintiffs ("Franchisees") each own and operate one or more hotels that bear a Choice brand mark.

6.     The vast majority of the Franchisees are single member limited liability companies or closely held corporations operated by hoteliers (the "Choice Hoteliers") who are either immigrants or second-generation Americans, with an origin in India and other parts of South Asia.

7.     The hotel franchise industry is particularly attractive to industrious New Americans like the Choice Hoteliers, because it gives them the opportunity to invest in a physically tangible, traditional old-economy business that they hope, through their own hard work and dedication, can serve as a legacy for their children.

8.     The vast majority of all Choice franchises are owned by Indian-American or South Asian-American hoteliers.

9.     This is an action to put an end to Choice's abusive, fraudulent and unconscionable practices, which are designed with one purpose in mind—namely, to line the pockets of its shareholders at the expense of the rights of its franchisees, including the Franchisees.

10.     A centerpiece of Choice's unlawful scheme is its mandate that Franchisees exclusively use vendors of Choice's choosing for the purchase of goods and services necessary to the running of a hotel.

11.     Choice represents to its Franchisees that it selects vendors with the goal of using the franchisees' collective bargaining power to secure a group discount, and to ensure adequate quality and supply of products and services.

12.     In fact, Choice's primary goal in negotiating with vendors is securing the largest possible kickback for itself, which vendors finance through charging Franchisees above-market rates.

13.     In 2019 alone, Choice netted more than $60 million from this fraudulent kickback scheme.

14.     Additionally, Choice engages in other oppressive, bad-faith, fraudulent, and unconscionable conduct.

15.     Choice routinely requires Franchisees to pay multiple fees for the same product or service.

16.     Choice routinely assesses additional fees against Franchisees for services and products that Choice either (a) does not in fact provide, or (b) provides at an inferior quality.

17.     Choice arbitrarily imposes rules and regulations and/or unreasonably interprets rules and regulations in order to justify assessing monetary penalties against Franchisees.

18.     Choice routinely discriminates against Indian-American and South Asian-American hoteliers by showing preferential treatment towards white hoteliers, particularly in the granting of key money to finance new construction.

19.     Choice corrupts the Choice Hotels Owners' Council ("CHOC"), an association of franchisees, by providing various benefits to members of its board in order to secure their support of Choice's oppressive agenda.

20.     Choice attempts to obstruct Franchisees from leaving the franchise system by imposing onerous liquidated damages provisions and assessing excessive penalties against departing franchises.

21.     Choice's actions are unconscionable and outrageous, and have pushed Franchisees to the financial breaking point.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over the federal law claims raised in this action pursuant to 18 U.S.C. § 1964.

23.     This Court has subject matter jurisdiction over the state law claims raised in this action 28 U.S.C. § 1367, because they arise from the same set of operative facts as the federal law claims.

24.     This Court has personal jurisdiction over Choice with regards to Plaintiffs' RICO claims pursuant to 18 U.S.C. § 1965(a), because Choice regularly transacts business within the geographic boundaries of this District by, *inter alia*, entering into franchising agreements with franchisees.

25.     This Court also has personal jurisdiction over Choice with regards to Plaintiffs' RICO claims pursuant to 18 U.S.C. § 1965(b), because the ends of justice require that CHOC be summoned to this district.

26.     This Court has pendant claim personal jurisdiction over Choice with regards to Plaintiffs' remaining causes of actions.

27.     This Court has personal jurisdiction over CHOC with regards to Plaintiffs' RICO claims pursuant to 18 U.S.C. § 1965(a), because CHOC regularly transacts business within the geographic boundaries of this District by, *inter alia*, collecting membership fees from franchisees.

28.     This Court also has personal jurisdiction over CHOC with regards to Plaintiffs' RICO claims pursuant to 18 U.S.C. § 1965(b), because the ends of justice require that CHOC be summoned to this district.

29.     Because of the RICO's statute's grant of personal jurisdiction over CHOC, this Court also has pendant claim personal jurisdiction over CHOC with regards to Plaintiffs' remaining causes of actions.

30.     Venue is proper in this judicial district pursuant to 18 U.S.C. §§ 1965(a), 1965(b), because Defendant Choice regularly transacts business within the geographic boundaries of this District by, *inter alia*, entering into franchising agreements with franchisors, because Defendant CHOC regularly transacts business within the geographic boundaries of this District by, *inter alia*¸ collecting membership fees from franchisees, and, in the alternative, because the ends of justice require CHOC to be summoned to this District.

## PARTIES

31.     Plaintiff Jai Sai Baba LLC is an Arizona registered limited liability company with its principal place of business located at 6347 E. Southern Ave., Mesa, Az 85206. Jai Sai Baba LLC operates a Choice franchise hotel—specifically a Sleep Inn—located in Arizona.

32.     Plaintiff Jenna Lodging LLC is an Alabama registered limited liability company with its principal place of business located at 161 Oxford Drive, Oxford, AL 3620.  Jenna

Lodging LLC operates a Choice franchise hotel—specifically a Quality Inn—located in Alabama.

33.     Plaintiff Q Hotels LLC is an Arkansas registered limited liability company with its principal place of business located at 3609 Moberly Lane, Bentonville, AR 72712. Q Hotels LLC operates a Choice franchise hotel—specifically, an EconoLodge Inn & Suites—located in Arkansas.

34.     Plaintiff Hot Springs Host Inc. is an Arkansas registered corporation with its principal place of business located at 4319 Central Avenue, Hot Springs, Arkansas 71913.Hot Springs Host Inc. operates a Choice franchise hotel—specifically, a Quality Inn & Suites— located in Arkansas.

35.     Collectively, the Plaintiffs operating hotels in Arkansas are referred to as the "Arkansas Franchisees."

36.     Plaintiff Radhe Radhe Corporation is a California registered corporation with its principal place of business located at 80 County Club Drive, Hayward CA 94542. Radhe Radhe Corporation operates a Choice franchise hotel—specifically, a Rodeway Inn & Suites—located in California.

37.     Plaintiff MS Investments, Inc. is a California registered corporation with its principal place of business located in 200 East Willow Street, Long Beach, CA 90806. MS Investments Inc. operates a Choice franchise hotel—specifically, an Ascend—located in California.

38.     Plaintiff Dahya Investments, Inc. is a California registered corporation with its principal place of business located at 4922 West Century Blvd., Inglewood, CA 90304. It operates a Choice franchise hotel—specifically, a Quality Inn & Suites—located in California.

39.     Plaintiff Laxmikrupa Corporation is a California registered corporation with its principal place of business at 753 Glendora Avenue, La Puente, CA 91744. Laxmikrupa Corporation operates a Choice franchise hotel—specifically a Comfort Suites—located in California.

40.     Plaintiff Krishna Hospitality LLC is a Delaware registered limited liability company with its principal place of business in 23420 Sussex Highway. It operates a Choice franchise hotel—specifically a Comfort Suites—located in Delaware.

41.     Plaintiff Laburnum Hospitality LLC is a Delaware registered limited liability company with its principal place of business located at 1612 N Dupont HWY, New Castle DE 19720. It operates a Choice franchise hotel—specifically a Clarion Hotel—located in Delaware.

42.     Plaintiff Veer Hotels, Inc. is a Delaware registered corporation with a principal place of business at 1259 Corn Crib Road, Harrington, DE. Veer Hotels, Inc. operates a Choice franchise hotel—specifically a Quality Inn and Suites—located in Delaware.

43.     Plaintiff Deerfield Hotel Two, LLC is a Florida registered limited liability company with its principal place of business at 1040 E. Newport Center Dr., Deerfield Beach, Florida 33442. Deerfield Hotel Two, LLC operates a Choice franchise hotel—specifically a Quality Inn & Suites—located in Florida.

44.     Plaintiff Sai Ram Krupa LLC is a Florida registered limited liability company with its principal place of business located at 7200 Plantation Road, Pensacola, FL 32504. It operates a Choice franchise hotel—specifically, a Quality Inn & Suites—located in Florida.

45.     Plaintiff Akshar Motel LLC is a Florida registered limited liability company with a principal place of business located at 285 SW Commerce Dr, Lake City, Florida 32025. It operates a Choice franchise hotel—specifically, a Quality Inn & Suites—located in Florida.

46.     Plaintiff Mars Hotel, LLC is a Florida registered limited liability company with a principal place of business located at 6737 Mahan Dr, Tallahassee, FL 32308. It operates a Choice franchise hotel—specifically a Qaulity Inn & Suites—located in Florida.

47.     Collectively, the Franchisees operating hotels in Florida are referred to as the "Florida Franchisees."

48.     Plaintiff Yashmira LLC is an Illinois registered limited liability company with its principal place of business located at 2209 John Deere Expressway, East Moline, IL 61244. It operates a Choice franchise hotel—specifically, a Comfort Inn & Suites—located in Illinois.

49.     Plaintiff Sun Motel LLC is an Indiana registered limited liability company with its principal place of business located at 2513 N. Michigan Street, Plymouth , IN 46563. It operates a Choice franchise hotel—specifically, a Comfort Inn—located in Indiana.

50.     Plaintiff Oak Hill Hotels LLC is an Indiana registered limited liability company with its principal place of business located at 2270 N. State Street, Greenfield,, IN 46140. It operates a Choice franchise hotel—specifically, a Quality Inn & Suites—located in Indiana.

51.     Plaintiff SRO Hotel LLC is an Indiana registered limited liability company with its principal place of business located at 1350 E. 83rd Avenue, Merrilville IN 46410. It operates a Choice franchise hotel—specifically, a Quality Inn & Suites—located in Indiana.

52.     Plaintiff Hanu LLC is an Indiana registered limited liability company with its principal place of business located at 1005 West Washington Center Rd, Fort Wayne Indiana 46825. It operates a Choice franchise hotel—specifically, a Comfort Inn—located in Indiana.

53.     Collectively, the Plaintiffs operating hotels in Indiana are referred to as the "Indiana Franchisees."

54.     Plaintiff Shree Jay Ganesh LLC is a Kansas registered limited liability company with its principal place of business located at 211 W. Crawford Street, Salina, KS 67401. It operates a Choice franchise hotel—specifically, a Quality Inn & Suites—located in Kansas.

55.     Plaintiff Sai Krish Hospitality LLC is a Kentucky registered limited liability company with a principal place of business located at 100 Howard Dr, Shelbyville KY 40065. It operates a Choice franchise hotel—specifically an Econolodge—located in Kentucky.

56.     Plaintiff Tundavia Hospitality LLC is a Louisiana limited liability company with its principal place of business at 9420 Healthplex Drive, Shreveport, Louisiana 71106. It operates a Choice franchise hotel—specifically a Comfort Inn—located in Louisiana.

57.     Plaintiff Jayden Hospitality LLC is a Louisiana limited liability company with its principal place of business located at 2949 Varsity Street, Baton Rouge, Louisana 70807. It operates a Choice franchise hotel—specifically, a Comfort Inn & Suites—located in Louisiana.

58.     Plaintiff Pineville Hospitality LLC is a Louisiana limited liability company with its principal place of business located at 205 Forest Drive, New Llano, Louisiana 71461. It operates a Choice franchise hotel—specifically, a Sleep Inn—located in Louisiana.

59.     Plaintiff Tundavia Investments LLC is a Louisiana limited liability company with its principal place of business located at 6715 Financial Plaza Circle, Shreveport, Louisiana 71129. It operates a Choice franchise hotel—specifically, a Comfort Suites—located in Louisiana.

60.     Plaintiff BIJ Hotel, LLC is a Louisiana registered limited liability company with its principal place of business located at 6015 Old Boyce Road, Alexandria, LA 71303. It operates a Choice franchise hotel—specifically, a Comfort Suites—located in Louisiana.

61.     Plaintiff AUM Investments LLC is a Louisiana registered limited liability company with its principal place of business at 37090 Market Center Blvd., Geismar, LA 70734. It operates two Choice franchise hotels—specifically a Sleep Inn and Mainstay Suites—located in Louisiana.

62.     Plaintiff Victor Hospitality LLC is a Louisiana registered limited liability company with its principal place of business located at 205 Forest Drive, New Llano, LA 71461. It operates a Choice franchise hotel—specifically, a Sleep Inn & Mainstay Suites—located in Louisiana.

63.     Plaintiff Shubham LLC is a Massachusetts registered limited liability company with its principal place of business at 1150 Riverdale Street., West Springfield, MA 01089. Shubham LLC operates a Choice franchise hotel—specifically a Sleep Inn and Mainstay Suites—located in Massachusetts.

64.     Plaintiff Newlight Inc. is a Massachusetts registered corporation with its principal place of business at 2 Southampton Road, Westfield, MA 01085. Newlight Inc. operates a Choice franchise hotel—specifically a Quality Inn—located in Massachusetts.

65.     Plaintiff Middleborough Hospitality LLC is a registered limited liability company with its principal place of business at 30 East Clark Street, Middleboro, MA 02346. It operates a Choice franchise hotel—specifically, a Quality Inn—located in Massachusetts.

66.     Plaintiff Jessup QI LLC is a Maryland registered limited liability company with its principal place of business located at 8828, Washington Blvd, Jessup, MD 20794. Jessup QI LLC operates a Choice franchise hotel—specifically a Quality Inn—located in Maryland.

67.     Plaintiff Caton Hospitality LLC is a Maryland registered limited liability company with its principal place of business located at 1401 Bloomfield Avenue, Baltimore,

MD 21227. Caton Hospitality LLC operates a Choice franchise hotel—specifically a Rodeway Inn—located in Maryland.

68.    Plaintiff Belmont Hospitality LLC is a Maryland registered limited liability company with its principal place of business located at 1807 Belmont Ave, Windsor Mill, MD 21244. It operates a Choice franchise hotel—specifically, a Quality Inn—located in Maryland.

69.    Plaintiff Elkridge Hospitality LLC is a Maryland registered limited liability company with its principal place of business at 5895 Bonnie View Lane, Elkridge, MD 21075. Elkridge Hospitality LLC operates a Choice franchise hotel—specifically an Econolodge— located in Maryland.

70.    Plaintiff Jai Swaminarayan Chestertown LLC is a Maryland registered limited liability company with its principal place of business at 5895 Bonnie View Lane, Elkridge, MD 21075. Jai Swaminarayan Chestertown LLC operates a Choice franchise hotel—specifically an Econolodge—located in Maryland.

71.    Collectively, the Plaintiffs operating Maryland franchises are referred to as the "Maryland Franchisees."

72.    Plaintiff Mahamati Inc. is a Michigan registered corporation with its principal place of business at 2896 Queen Annes Ct., Bay City, MI 48706. Mahamati Inc. operates a Choice franchise hotel—specifically an Econolodge—located in Michigan.

73.    Plaintiff DC Hotels LLC is a Minnesota registered limited liability company with its principal place of business at 810 Happy Trails Ln., Albert Lea, MN 56007. DC Hotels LLC operates a Choice franchise hotel—specifically a Comfort Inn—located in Minnesota.

74.    Plaintiff Southaven Hotels LLC is a Mississippi registered limited liability company with a principal place of business located at 7075 Moore Drive, Southaven, MS,

38671. It operates a Choice franchise hotel—specifically, a Comfort Suites—located in
Mississippi

     75.    Plaintiff A1 Group LLC is a North Carolina registered limited liability company
with a principal place of business located at 360 Whiteville Rd NW, Shallotte, NC 28459.  It
operates a Choice franchise hotel—specifically, a Comfort Inn—located in North Carolina.

     76.    Plaintiff Albemarle Hospitality LLC is a North Carolina registered limited
liability company with its principal place of business located at 306 S. Hughes Blvd., Elizabeth
City, NC 27909. Albermarle Hospitality LLC operates two Choice franchises hotel—
specifically, Comfort Inn and Qualiy—located in North Carolina.

     77.    Plaintiff Heli Hospitality LLC is a North Carolina registered limited liability
company with its principal place of business located at 309 Brandywine Dr., Raleigh, NC
27607. Heli Hospitality, LLC operates a Choice franchise hotel—specifically a Quality Inn—
located in North Carolina.

     78.    Plaintiff Shiva Hospitality LLC is a North Carolina registered limited liability
company with its principal place of business located at 19608 Liverpool Parkway, Cornelius,
NC 28031. It operates a Choice franchise hotel—specifically, a Clarion Inn & Suites—located
in North Carolina.

     79.    Plaintiff Deepak LLC is a North Carolina registered limited liability company
with its principal place of business located at 400 US HWY 70 West, Havelock, NC 28532. It
operates a Choice franchise hotel—specifically, a Quality Inn—located in North Carolina.

     80.    Plaintiff Krishiv Hospitality LLC is a North Carolina registered limited liability
company with its principal place of business located at 1725 Jim Johnson Road, Fayetteville,

NC 28312. It operates a Choice franchise hotel—specifically, a Quality Inn—located in North Carolina.

81.    Plaintiff Havelock Hospitality LLC is a North Carolina registered limited liability company with its principal place of business at 1013 E Main St., Havelock, NC 2853. Havelock Hospitality LLC operates a Choice franchise hotel—specifically, a Quality Inn—located in North Carolina.

82.    Plaintiff AHKH LLC is a limited liability with its principal place of business at 4716 New Bern Avenue, Raleigh NC 27610. AHKH LLC operates a Choice franchise hotel—specifically, a Quality inn—located in North Carolina.

83.    Plaintiff  Outerbanks Hotel LLC is a North Carolina registered limited liability corporation with its principal place of business at 401 N. Virginia Dare Trail, Kill devil Hills, NC 27948. Outerbanks Hotel LLC operates a Choice franchise hotel—specifically, a Quality Inn—located in North Carolina.

84.    Plaintiff A&A Hospitality Inc. is a North Carolina corporation with its principal place of business at 2539 South Saunders St., Raleigh, NC 27603. A&A Hospitality Inc. operates a Choice franchise hotel —specifically, a Quality Inn—located in North Carolina.

85.    Plaintiff Premier Hospitality, LLC is a North Carolina limited liability company with its principal place of business at 1011 East Cumberland St., Dunn, NC 28334. A&A Hospitality Inc operates a Choice franchise hotel —specifically, a Quality Inn—located in North Carolina.

86.    Plaintiff Highmark Lodging LLC is a North Dakota registered limited liability company with its principal place of business at 475 15th St. W, Dickinson, ND 58601.

Highmark Lodging LLC operates a Choice franchise hotel —specifically, a Quality Inn & Suites—located in North Dakota.

87.     Plaintiff MYGHM Cookstown LLC is a New Jersey registered limited liability company with its principal place of business at 21 Wrightstown Cookstown Road, Cookstown, NJ 08511. MYGHM Cookstown LLC operates a Choice franchise hotel —specifically, a Quality Inn—located in New Jersey.

88.     Plaintiff JSK Middletown LLC is a New Jersey registered limited liability company with its principal place of business at 750 Rt. 35 South, Middletown, NJ 07748. R Middletown LLC operates a Choice franchise hotel —specifically, a Quality Inn—located in New Jersey.

89.     Plaintiff West Windsor Lodging, LLC is a New Jersey registered limited liability company with its principal place of business at 3499 Route One South, Princeton, NJ 3499 08540. West Windsor lodging, LLC operates a Choice franchise hotel —specifically, a Clarion—located in New Jersey.

90.     Plaintiff Jai Swaminarayan Gloucester LLC is a New Jersey registered limited liability company with its principal place of business located in New Jersey. Jai Swaminarayan Gloucester LLC operates a Choice franchise hotel—specifically, a Rodeway Inn—located in New Jersey.

91.     Collectively, the Plaintiffs that operate hotels in New Jersey are known as the "New Jersey Franchisees."

92.     Plaintiff Syracuse Hotel Partners LLC is a New York registered limited liability company with its principal place of business located at 6611 Old Collamer Rd S, Syracuse NY

-15-

13057. Syracuse Hotel Partners LLC operates a Choice franchise hotel—specifically, a Quality Inn—located in New York.

93.     Plaintiff Akash Hotels LLC is a New York registered limited liability company with its principal place of business located at 310 Wild Ave., Staten Island, NY 10314. Akash Hotels LLC operates a Choice franchise hotel—specifically, a Comfort Inn—located in New York.

94.     Plaintiff Dip Hospitality LLC is a New York registered limited liability company with its principal place of business located at 901 Dick Road, Buffalo, NY 14225. Dip Hospitality LLC operates a Choice franchise hotel—specifically, a Comfort Suites—located in New York.

95.     Plaintiff Hartwick Hotel Company LLC is a New York registered limited liability company with its principal place of business located at 4470 State Hwy 28, Milford NY 13807. Hartwick Hotel Company LLC operates a Choice franchise hotel—specifically, a Comfort Inn & Suites—located in New York.

96.     Collectively, the Plaintiffs that operate hotels in New York are known as the "New York Franchisees."

97.     Plaintiff Sunburst Hotels LLC is an Ohio registered limited liability company with its principal place of business in Ohio, and a mailing address of P.O. Box  773, New Albany, OH 43054. Sunburst Hotels LLC operates a Choice franchise hotel—specifically, a Quality Inn—located in Ohio.

98.     Plaintiff Atmiyata Hotels LLP is an Oklahoma registered limited liability partnership with a principal place of business at 3112 S. 79th East Avenue, Tulsa, OK. It operates a Choice franchise hotel—specifically, a Quality Suites—located in Oklahoma.

99.     Plaintiff Muhlenberg Motel Corporation is a Pennsylvania registered corporation with a principal place of business at 2200 Stacey Drive, Reading, PA 19605. It formerly operated a Choice franchise hotel—specifically, a Comfort Inn—located in PA.

100.    Plaintiff Elite Hospitality LLC is an Ohio registered limited liability company with its principal place of business in Ohio, and a mailing address of P.O. Box  773, New Albany, OH 43054. Elite Hospitality LLC operates a Choice franchise hotel —specifically, a Quality Inn—located in Ohio.

101.    Plaintiff Shree Jay Bhole Inc. is a Pennsylvania registered limited liability company with its principal place of business located at 222 Arsenal Road, York, PA 17402. Shree Jay Bhole Inc. operates a Choice franchise hotel—specifically, an Econolodge—located in Pennsylvania.

102.    Plaintiff Reading Hotels LLC is a Pennsylvania registered limited liability company with its principal place of business at 2200 Stacey Drive, Reading, PA 19605. Reading Hotels LLC operates a Choice franchise hotel—specifically, a Comfort Inn—located in Pennsylvania.

103.    Plaintiff JSK Pottstown LLC is a Pennsylvania registered limited liability company with its principal place of business at 61 West King St., Pottstown, PA 19464. KSK Pottstown LLC operates a Choice franchise hotel—specifically, a Quality Inn—located in Pennsylvania.

104.    Plaintiff Sai Ram Hoteliers LLC is a Pennsylvania registered limited liability company with its principal place of business located at 1896 Rich Hwy, Du Bois, PA 15801. Sai Ram Hoteliers LLC operates a Choice franchise hotel—specifically, a Clarion Inn—located in Pennsylvania.

105.    Plaintiff Trimil Columbia LLC is a Pennsylvania registered limited liability company with its principal place of business located at 3903 Abel Drive, Columbia, PA 17512. It operates a Choice franchise hotel—specifically, a Comfort Inn—located in Pennsylvania.

106.    Plaintiff Gettysburg Hotels LLC is a Pennsylvania registered limited liability company with its principal place of business located at 945 Baltimore Pike, Gettysburg, PA 17325. Gettysburg Hotels LLC operates a Choice franchise hotel—specifically, a Comfort Suites—located in Pennsylvania.

107.    Plaintiff JSK New Hope LLC is a Pennsylvania registered limited liability company with its principal place of business located at 6426 Lower York Road, New Hope, PA 18938. JSK New Hope LLC operates a Choice franchise hotel—specifically, a Clarion Inn—located in Pennsylvania.

108.    Plaintiff Shree Ram Krupa Lodging Group, Inc. is a Pennsylvania registered corporation with its principal place of business at 2845 Lebanon Road, Manheim. PA 17545. It operates a Choice franchise hotel—specifically, a Comfort Inn—located in Pennsylvania.

109.    Plaintiff Fairmount Hospitality LLC is a Pennsylvania registered limited liability company with a principal place of business located at 101 Broad St. Delaware Water Gap, Monroe PA 18327. It operates a Choice franchise hotel—specifically a Clarion Inn and Suites—located in Pennsylvania.

110.    Plaintiff RRR Hotel LLC is a Pennsylvania registered limited liability company with its principal place of business located at 815 N Pottstown Pike, Exton, PA 19341. RRR Hotel LLC operates two Choice franchise hotels—specifically, a Clarion Hotel and a Quality Inn—located in Pennsylvania.

111.   Plaintiff AVIS Hospitality Inc. is a South Carolina registered corporation with its principal place of business at 3755 Grandview Drive, Simpsonsville SC 29680. AVIS Hospitality Inc operates a Choice franchise hotel—specifically, a Quality Inn—located in South Carolina.

112.   Plaintiff Annpurna SC LLC is a South Carolina registered limited liability company with its principal place of business at 611 West Wade Hampton Blvd. Annpurna SC LLC operates a Choice franchise hotel—specifically, a Quality Inn—located in South Carolina.

113.   Plaintiff Om Company is a Tennessee registered corporation with its principal place of business located at 2655 Westside Drive NW, Cleveland, TN, 37312. Om Company operates a Choice franchise hotel—specifically, an Econolodge—located in Tennessee.

114.   Plaintiff Savan LLC is a Tennessee registered corporation with its principal place of business located at 107 Interstate Dr NW 37421, Cleveland TN. Savan LLC operates a Choice franchise hotel—specifically, a Comfort Inn & Suites—located in Tennessee.

115.   Plaintiff AJK Hospitality LLC is a Tennessee registered limited liability company with its principal place of business located at 1199 Linden Avenue, Memphis, TN 38104. It operates a Choice franchise hotel—specifically, a Rodeway Inn—located in Tennessee.

116.   Plaintiff Megh Varsha Inc. is a Tennessee registered corporation with its principal place of business located at 500 Lovell Rd, Knoxvville, TN 37932. I It operates a Choice franchise hotel—specifically an EconoLodge—located in Tennessee.

117.   Plaintiff Shri Ganpati Ent. LLC is a Texas registered limited liability company with its principal place of business located at 3817 N. PanAm Expwy, San Antonio, Texas 78219. It operates a Choice franchise hotel—specifically, a Quality Inn & Suites—located in Texas.

118.     Plaintiff Jay Gurudev LP is a Texas registered limited partnership with its principal place of business located at 1209 N. Interstate 35, New Braunfels TX 78130. It operates a Choice franchise hotel—specifically, a Rodeway Inn—located in Texas.

119.     Plaintiff Savni Inc. is a Texas registered corporation with its principal place of business located at 1719 S. Dumas Avenue, Dumax, TX 79029. It operates a Choice franchise hotel—specifically, an EconoLodge—located in Texas.

120.     Plaintiff King Ranch Investments, LLC is a Texas limited liability company with its principal place of business located at 5922 Tallow Lane, Frisco, Texas 75036. It operates a Choice franchise hotel—specifically, a Comfort Inn & Suites—located in Texas.

121.     Plaintiff Oumshiva Inc is a Texas registered corporation with its principal place of business at located at 2620 Commerce Street, Buffalo, Texas 75831. It operates a Choice franchise hotel—specifically, a Quality Inn—located in Texas.

122.     Aatma LLC is a Texas registered limited liability company with a principal place of business of 120 S. Main Street, Jewett, Texas 75846. It operates a Choice franchise hotel—specifically, a Comfort Suites—located in Texas.

123.     Plaintiff 9M9 Hospitality Inc. is a Texas registered corporation with its principal place of business at 1615 NE Big Bend Trail, Glen Rose, TX 76043. It operates a Choice franchise hotel—specifically, a Comfort Inn & Suites—located in Texas.

124.     Plaintiff Jai Maa Universal, LLC is a Texas registered limited liability company with its principal place of business at 222 W. Airtex Blvd, Houston, TX 77090. Jai Maa Universal, LLC operates a Choice franchise hotel—specifically, a Sleep Inn and Suites—located in Texas.

125.    Plaintiff Digambara LLC is a Texas registered limited liability company with its principal place of business located at 610 E. Central Texas Expy, Killeen, Texas 76541. It operates a Choice franchise hotel—specifically, a Qaulity Inn—located in Texas.

126.    Plaintiff Sagar Ent Inc. is a Virginia registered corporation with its principal place of business located at 2400 Stadium Road, Lynchburg, VA 24501. It operates a Choice franchise hotel—specifically, an EconoLodge—located in Virginia.

127.    Plaintiff VAB 435 Oceanfront LLC is a Virginia registered limited liability company with its principal place of business located at 705 Atlantic Avenue, Virginia Beach, Virginia. VAB 435 Oceanfront LLC operates a Choice franchise hotel—specifically, a Quality Inn & Suites—located in Virginia.

128.    Plaintiff Bapup Inc. is a Virginia registered corporation with its principal place of business located at 38769 Governor G C Peery Hwy, Bluefield, VA 24605. It operates a Choice franchise hotel—specifically, a Comfort Inn—located in Virginia.

129.    Certain Franchisees, namely Elite Hospitality LLC and Sunburst Hotels, LLC, contracted with Choice to participate in optional regional marketing cooperatives. These Franchisees are collectively referred to herein as "Marketing Cooperative Franchisees."

130.    Defendant Choice is a Maryland-registered corporation with its principal place of business located at 1 Choice Hotels Cir Suite 400, Rockville, MD 20850.

131.    Defendant Choice Hotels Owners Council is, on information and belief, a North Carolina-registered corporation with a principal place of business at 4200 Morganton Road, Suite 200-13, Fayetteville, NC 28314. It purports to be in the business of representing the interests of Choice franchisees.

## COMMON FACTUAL ALLEGATIONS

A.     **The Uneven Relationship between Choice and its Franchisees**

132.   Choice has been in operation since 1939.

133.   Throughout its history, Choice has created and acquired hotel brands, including Comfort Inn, Comfort Suites, Quality Inn, Sleep Inn, Clarion, Cambria Suites, MainStay Suites, Suburban Extended Stay Hotels, EconoLodge, Rodeway Inn, and Ascend Hotel Collection.

134.   Choice licenses the right to use these hotel brand marks to franchisees, including the Franchisees, by entering into Franchise Agreements with them.

135.   As is the case for all business owners, Franchisees assume certain risks when operating their franchises.

136.   In the event of business failure or slowdown—a fact of life that the current pandemic has made all too familiar to hoteliers—Franchisees will be unable to, *inter alia*, make payroll, make rent, pay utilities, pay insurance premiums, and pay property taxes. That is, if Franchisees' businesses fail, they will not merely lose the opportunity to make profits; they will remain responsible for the financial burdens associated with owning a non-performing, depreciating asset.

137.   Choice, on the other hand, bears relatively little risk in the event that a particular Franchisee's business fails.

138.   Choice, whose only significant assets are its intellectual property (the hotel brand marks) and the franchise system itself, does not assume legal responsibility for any debt or non-performing, depreciating assets in the event that that a particular Franchisee's business fails.

139.   Indeed, Choice does not even bear the risk of nonpayment of royalties and other monthly fees in the event of a Franchisee's business failure or slowdown.

-22-

140.    Despite—or perhaps partially due to—the fact that Franchisees inherently assume considerably more risk than Choice in the operation of each hotel franchise, Choice uses its superior bargaining power to coerce the Franchisees into accepting onerous, unequal, and unconscionable terms in its Franchise Agreements.

141.    These onerous terms put immense financial stress on Franchisees, threatening their economic viability.

142.    In entering into the Agreements, Choice's bargaining power is vastly superior to the Franchisees.

143.    Choice exploits this disparity in bargaining power to require Franchisees to enter into one-sided contracts of adhesion.

144.    These one-sided Agreements are lengthy, complex, confusing, and, for all intents and purposes, non-negotiable.

145.    Choice also uses and abuses its superior bargaining power by, among other things, requiring Franchisees to sign a tripartite comfort letter with third-party lenders.

146.    These agreements are not standard in the franchising industry.

147.    Under the terms of the comfort letter, in the event of business failure or slowdown, the third-party lender compensates Choice for the loss of revenue, while the Franchisee remains responsible for indemnifying the third-party lender.

148.    Choice charges (and the Franchisees actually pay) a $1,500 fee for the privilege of entering in agreement that only benefits Choice, underlying the uneven and exploitative relationship between the parties.

### B. Choice's Fraudulent and Unconscionable Kickback and Price-Fixing Scheme

149.    Choice's fraudulent and unconscionable scheme cannot operate without Franchisees paying excessive, above-market rates for the goods and services necessary to run a

hotel, including but not limited to, credit card processing services, financial software, furniture, furnishing, linens, food products, utensils, and goods for guests' consumption (the "Necessary Products").

150.   The above-market rate pricing provides the money necessary for vendors to pay Choice's kickback.

151.   Choice knowingly and willfully engages in conduct that ensures Franchisees pay above-market prices for the Necessary Products.

152.   Choice engages in this knowing and willful conduct despite making express representations to Franchisees, shareholders and the public that it will obtain volume discounts from vendors for the Necessary Products.

### i. Choice's Fraudulent and Inconsistent Representations Regarding the Nature of its Relationship with Qualified Vendors

153.   Under the Agreement, Choice requires that Franchisees purchase some or all of the Necessary Products from vendors of its own choosing (the "Qualified Vendors").

154.   In the Agreement, Choice represents to Franchisees that it will limit the number of Qualified Vendors for a given product only for the purposes of obtaining a group or volume discount and ensuring uniform quality and supply of that Necessary Product.

155.   In fact, Choice made an internal decision in or around 2012 to further limit the number of Qualified Vendors.

156.   In an article published on June 19, 2013, Choice's Vice President of Procurement Services, Rick Summa, was quoted as saying that this decision was done to enable Choice "to brand programs more effectively and efficiently." Alan Dorich, *Choice Hotels International*, Supply Chain Best Practices (June 19, 2013), available at https://www.bestsupplychainpractices.com/2013/06/choice-hotels-international/.

157.   Upon information and belief, Mr. Summa's stated justification for the change was and is false.

158.   Upon information and belief, the change also had nothing to do with obtaining greater discounts or improving brand quality.

159.   Upon information and belief, Choice limits the number of Qualified Vendors as part of a scheme to reduce competition within the Choice Franchise System, which in turn, allowed Choice to extract larger kickbacks from vendors. And the scheme works.

160.   Following that change, Choice's revenues from vendor kickbacks skyrocketed.

161.   Choice does not disclose to Franchisees when it receives a kickback (or "rebate" as Choice refers to it), or the amount of any such "rebate".

162.   The intended purpose and effect of Choice's kickback scheme is that Qualified Vendors charge above-market rates for their goods and services. Choice nevertheless represents that its Procurement Services Department actually helps Franchisees:

- "Helping Choice franchisees achieve total success is the driving force behind the Procurement Services Department. Our mission is to simplify the purchasing process at the hotel level. We ensure that Qualified Vendors supply Choice properties with products and services that meet stringent requirements for quality, reliability, performance and value.

- "And we don't stop there…

- "Acting as a liaison between Choice's franchisees and Qualified Vendors, we work daily with franchisees to discuss purchasing solutions and vendor programs that will enable owners and general managers to buy appropriate supplies and resources to operate in their hotel in the most cost-effective

and efficient way . The staff is knowledgeable on all of the products and services offered by Choice's Qualified Vendors. We can help you save time and money on all of your purchasing needs."

163.   These representations are at odds with representations Choice makes to its investors in its SEC 10-K form, in which it states:

- "Procurement services revenues. The Company generates procurement services revenues from qualified vendors. Procurement services revenues are generally based on marketing services provided by the Company on behalf of the qualified vendors to hotel owners and guests. The Company provides these services in exchange for either fixed consideration or a percentage of revenues earned by the qualified vendor pertaining to purchases by the Company's franchisees or guests. Fixed consideration is allocated and recognized ratably to each period over the term of the agreement. Variable consideration is recognized in the period when sales to franchisees or guests from vendors are known or cash payment has been remitted. Qualified vendor revenues are recognized within Procurement services revenue."

164.   Essentially, Choice offers two competing and mutually exclusive explanations for its acquisition of what it alternatively refers to as "rebates" or "procurement services revenue."

165.   On one hand, Choice claims to be negotiating *on behalf of Franchisees* to acquire group discounts and to ensure adequate supply and quality of products from Qualified Vendors. That is, it claims to be acting as the agent of the Franchisees vis-à-vis their dealings with Qualified Vendors.

166.   On the other hand, Choice claims to be providing a marketing service to Qualified Vendors with relation to the Franchisees. That is, it claims to be acting as the agent of the Qualified Vendors vis-à-vis their dealings with the Franchisees.

167.   Upon information and belief, *neither* of these representations is true.

168.   Choice's Procurement Services Department is acting to benefit Choice.

169.   Upon information and belief, Choice either does not provide any marketing services to Qualified Vendors, or, if they do, the "rebates" or "procurement services revenues" are not paid in exchange for these marketing services.

170.   Choice does not help Franchisees "save time and money" on their "purchasing needs."

171.   Choice does not obtain group or volume discounts on behalf of its Franchisees.

172.   Choice does not ensure adequate brand quality and supply; rather, Choice at times forces Franchisees to use inferior Necessary Products, and creates unnecessary transactional costs by repeatedly *changing*, over short periods of time, which Qualified Vendors can supply Necessary Products.

173.   This conduct shows that Choice is not attempting to promote brand quality, but is constantly auctioning off the right to sell Necessary Products to Franchisees to the highest bidder.

174.   Choice is leveraging its Franchise System to secure massive fees from vendors.

### *ii. Choice's Price-Fixing and Kickback Scheme*

175.   Choice has turned its Qualified Vendor Program into a pay-to-play system.

176.   Upon information and belief, a company cannot even be considered—much less approved—as a potential Qualified Vendor unless they pay a $25,000 "introduction fee".

177.    To be approved as a Qualified Vendor and gain access to Choice's restricted Franchise Market, Choice requires a *quid pro quo* in the form of kickbacks.

178.    The kickbacks include *both* fixed fees paid by Qualified Vendors to Choice, and transactional fees based on a percentage of Qualified Vendors' total sales to Franchisees and their guests.

179.    The transactional fees are inextricably tied to the cost of the goods and services, meaning that as Choice's revenue from transactional fees increases as the cost of goods and services increases.

180.    Choice therefore has an inherent conflict of interest that it never disclosed to Franchisees.

181.    Upon information and belief, Choice's conflict of interest has led to abuse.

182.    Upon information and belief, Choice has chosen its interests and the interests of Qualified Vendors over those of its Franchisees.

183.    Upon information and belief, Choice has conspired with manufacturers and distributors to increase cost of goods and services that are sold to its Franchisees.

184.    Upon information and belief, Choice has colluded with manufacturers and/or distributors to fix the pricing of goods sold by manufacturers to Qualified Vendors.

185.    Upon information and belief, Choice colludes with manufacturers and/or distributors to increase the wholesale price of products, which in turn, increases the retail prices Qualified Vendors must sell to Franchisees.

186.    Upon information and belief, Choice effectively fixes the retail pricing of goods and services sold to Franchisees.

187.   Upon information and belief, Choice knows that Qualified Vendors cannot sell goods and services to its Franchisees at competitive prices.

188.   Upon information and belief, Choice knows that Qualified Vendors must increase the cost of goods and services to account for the increased wholesale costs and well as the fixed and transactional fees that must be paid to Choice.

189.   Upon information and belief, Choice knows that Qualified Vendors will pass these costs onto Franchisees.

190.   Upon information and belief, Franchisees ultimately are the ones harmed by Choice's price fixing and kickback scheme.

191.   One of many examples of Choice's malfeasance can be seen by comparing the prices paid by Choice Franchisees for Jimmy Dean frozen sausage links with the price paid non-Choice franchisees for the same product.

192.   Choice Franchisees pay $34.50 for ten pounds of sausage links, while non-Choice Franchisees pay $22.37 for the same quantity of sausage links. Choice Franchisees thus pay more than 54% upcharge for sausage links—an upcharge that finances the substantial kickback paid to Choice.

193.   Another example of Choice's malfeasance can be seen in its selection of Shift4 Payment, LLC ("Shift4") as the only Qualified Vendor for credit card gateway services.

194.   The selection of Shift4 did not relate to any group discount secured on behalf of the Franchisees, nor did it relate to the securing of adequate brand quality or supply for Franchisees.

195.   Because they are required to use Shift4, Franchisees pay above-market rates for credit card gateway services.

196.    Franchisees additionally incur damages due to the fact that Shift4 honors customer chargebacks at a rate significantly higher than other credit card gateway servicers, without adequately investigating to determine whether the chargebacks are fraudulent or otherwise improper.

197.    While Choice purports to give Franchisees the right to, at Choice's discretion, purchase Necessary Products from vendors other than the Qualified Vendors, in practice Choice rarely, if ever, grants Franchisees permission to do so.

198.    Essentially, Choice offers it Franchisees no meaningful choice in vendors.

### iii. The Kickbacks are a Growing Profit Center for Choice

199.    In 2001, Choice's revenue from payments from its Qualified Vendors—which it reported in its SEC 10-K form as "Procurement Revenue Partner Services"—totaled approximately $12,000,000.

200.    In 2013, Choice's revenue from payments from its Qualified Vendors—which it reported in its SEC 10-K form as a "Procurement Revenue"—totaled approximately $20,700,000.

201.    In a period of twelve years, Choice's revenue from the Qualified Vendors rose by an additional 72.5%.

202.    In 2019, Choice's revenue from payment from its Qualified Vendors totaled approximately $61,400,000.  Thus, in the six year period following Choice's restriction on Qualified Vendors, Choice's revenue increased by an additional 196%. In real terms, this represents over $40,000,000 in revenue.

203.    This revenue in form comes from Qualified Vendors as a purported marketing fee but in substance the revenue comes from the Franchisees.

204.    At the time the Franchisees entered into the Agreements, Choice misrepresented and/or concealed the nature of its relationship with Qualified Vendors, in order to lock them into the onerous Agreements and create excessive switching costs.

**C.    Choice's Double Dipping and Imposition of Unconscionable Fees and Penalties**

205.    Under the Agreements, the only fees expressly required of the Franchisees are a Royalty and System Fee.

206.    These fees are based on a fixed percentage of the Franchisees' revenue.

207.    These fees constitute approximately 7-10% of Franchisees' monthly revenue.

208.    The Agreements, however, also purport to give Choice the unfettered and unilateral right to impose additional fees, penalties, rules, and regulations.

209.    Choice arbitrarily exercises this purported right in bad-faith, in order to capture an ever-increasing share of the Franchisees' revenue.

210.    These fees, penalties, and regulations impose tremendous and unreasonable burdens on Franchisees and frequently bear no relationship to improving or maintaining brand quality or uniformity.

211.    Moreover, the manner and degree to which Choice imposes these fees, penalties and regulations is unreasonable and acts to defeat the essential purpose of the agreement for its Franchisees.

212.    Choice's inclusion and bad-faith implementation of this purported right is unconscionable.  As a direct result of Choice's bad-faith conduct and unconscionable conduct, Franchisees end up paying, on average, in excess of 20% of their monthly revenue to Choice.

*i. Choice's Duplicative Fees*

213.    Choice routinely charges Franchisees multiple fees for the same products or services, and/or additional fees for services that it is contractually obligated to perform.

-31-

214.  Choice's improper assessment of fees includes but is not limited to its reservation system.

215.  In the Agreements, Choice represents to Franchisees that they will have access to Choice's reservation system through payment of a monthly "System Fee."

216.  Choice represents that its relationship with online travel agencies ("OTAs") constitutes part of its reservation system.

217.  Despite these representations, Choice charges Franchisees an additional fee—a so-called "Channel Management Fee"—for access to OTAs.

218.  This fee is on top of fees that Franchisees must pay OTAs directly.

219.  Additionally, Choice requires Franchisees to pay fees associated with its "Choice Hotels Enhanced Reservation Program" ("CHERP") in order to access direct bookings through choicehotels.com. These fees are mandatory.

220.  In essence, Choice *triple* dips, requiring Franchisees to pay it three separate times for full access to its reservation system.

221.  Choice also at times diverts funds that it is contractually obligated to use for marketing expenses into its own pockets.

222.  Specifically, Choice falsely represents to Franchisees that it has obtained a discount from a Qualified Vendor for certain Necessary Products, and that the acquisition of this discount entitle it to compensation.

223.  Choice then "reimburses" itself through the marketing funds.

224.  In point of fact, Choice never acquires discounts from Qualified Vendors, and in fact receives kickbacks from Qualified Vendors for each transaction they enter into with Franchisees.

### *ii. Failure to Provide Services for Fees Assessed*

225.   Choice routinely charges Franchisees fees for which the Franchisees in fact receive no benefit.

226.   Choice also increases fees while at the same time decreasing the quality of services rendered.

227.   For example, Choice has increased the fees associated with its customer service program, while simultaneously off-shoring that program to the Philippines.

228.   The language barrier between Franchisees and Choice's customer service staff has dramatically reduced the quality of Choice's customer service.

229.   Additionally, Choice at times offers optional benefits, which Franchisees can access with the payment of additional fees.

230.   Choice routinely fails to provide any additional benefit in exchange for the payments of these fees.

231.   For example, the Marketing Cooperative Franchisees entered into an agreement with Choice in which they would receive marketing benefits in exchange for the payment of additional fees.

232.   The Marketing Cooperative Franchisees have in fact received no additional benefit from Choice.

### *iii. The Imposition of Unreasonable Monetary Penalties*

233.   In an additional attempt to gouge Franchisees for revenue, Choice either imposes arbitrary rules and regulations, or interprets its rules and regulations in an unreasonable and bad faith manner, in order to extract monetary penalties from Franchisees.

234.   For example, Choice imposes monetary penalties on Franchisees who fail to maintain a certain ratio of positive to negative reviews, which are recorded by the third-party company Medalia.

235.   The "Medalia" review process fails to accurately capture guest experience.

236.   The "Medalia" review process does not account for the fact that many negative reviews are due to Choice's conduct, and not the conduct of Franchisees.

237.   By way of example, Choice's reservation system regularly fails to work properly, causing distress to guests and to Franchisees. Because of the failures of this reservation system, Franchisees, through no fault of their own, have received negative reviews.

238.   Additionally, Choice, in cooperation with Medalia, arbitrarily discounts certain of Franchisees' positive reviews, in order to shift the Franchisees' ratio of positive reviews and charge a monetary penalty.

239.   Choice uses the imposition of arbitrary penalties to increase revenue.

240.   Choice also uses penalties to force Franchisees to accept concessions, and when these concessions are not accepted, Choice has retaliated by terminating relationships with Franchisees.

### D. Choice's Unconscionable Inclusion of Exculpatory Clauses in the Agreement

241.   Choice includes provisions in its Agreements to deter Franchisees from challenging the Agreements generally and/or Choice's enforcement of the Agreements specifically.

242.   Choice requires Franchisees to waive their rights to a trial by jury.

243.   Choice requires Franchisees to waive their rights to participate in a class action.

244.   Choice requires Franchisees to submit to binding arbitration.

245.   Choice requires Franchisees to conduct the arbitration in Choice's Maryland headquarters, regardless of where their franchise is located.

246.   Choice requires Franchisees to waive the right to any pre-hearing discovery.

247.   Choice requires Franchisees to submit to Maryland choice of law clauses.

248.   However, Choice specifically notes in the Agreement that the Franchisees' submission to Maryland law does not establish that Maryland's Franchise Law applies to the relationship Franchisees and Choice.

249.   Essentially, Choice seeks to exculpate itself from liability under *any* state franchising statute.

250.   Additionally, Choice requires Franchisees to run the risk of paying to Choice all of its attorneys' fees, expert costs, witness costs, and arbitration costs, if Franchisees do not prevail in arbitration.

251.   The purpose and intent of this and the other provisions is to make it economically unviable for its much smaller Franchisees to pursue claims against Choice.

252.   These provisions, taken together with the Agreement as a whole, are unconscionable.

### E. Choice's Racial Discrimination Against Indian-American and South Asian-American Franchisees

253.   In its relations with its franchises, Choice routinely discriminates in favor of white hoteliers and against Indian-American and South Asian-American hoteliers, by offering preferential treatment to the former and more strictly enforcing rules and regulations against the latter.

254.    An example of Choice's malfeasance can be seen in the aftermath of its 2016 announcement that it would no longer allow franchises that operate out of two-story properties to continue to bear the Comfort Inn brand mark.

255.     On information and belief, this regulation was enforced aggressively against franchises, including the Franchisees, owned by Indian-American and South Asian-American hoteliers in order to terminate their franchises.

256.    Simultaneously, on information and belief, this regulation was laxly enforced by franchisees owned by white hoteliers.

257.    Additionally, even after Choice's purported disallowance of two-story buildings, Choice allowed certain white hoteliers to *begin* operating new Comfort Inn franchises using two-story structures.

258.    Choice thus discriminated against franchises due to their Indian-American or South Asian-American ownership.

259.    Additionally, Choice routinely circumvents, or attempts to strong-arm, Franchisees and other Indian-American and South-Asian American hoteliers into waiving negotiated regional exclusivity provisions in favor of franchises owned by white hoteliers.

260.    In offering key money to hoteliers to finance the building of new hotel construction, Choice disproportionately favors white hoteliers, generally offering Indian-American and South Asian hoteliers only fractional amounts, if any, of the key money offered to similarly situated white hoteliers.

261.    Choice, in effectively appointing regional directors to CHOC, appoints white hoteliers to approximately 60% of open positions, despite the fact that its franchisees are 75-85% Indian-American or South Asian-American.

262.    Choice executives routinely make racially derogatory comments to and about their Indian-American and South Asian-American franchisees, including the Franchisees.

### F. Choice's Collusion with the Choice Hotels Owner Council

263.    Through the Agreement, Choice requires Franchisees to pay a monthly association fee to the Choice Hotels Owner Council ("CHOC").

264.    Choice represents to Franchisees that CHOC makes good faith efforts to protect the interests of Franchisees.

265.    CHOC makes these same representations to Franchisees.

266.    In fact, CHOC's board members are essentially handpicked by Choice, and receive luxury incentives—including but not limited to algorithmic preference in the reservations systems, the benefits of sales blitzes, access to luxurious corporate retreats, and limousine services—in exchange for their loyalty to Choice's agenda.

267.    While CHOC's board members are nominally elected by all franchise owners at Choice's annual meeting, it is essentially impossible for dissenting voices to gain seats on the board.

268.    Choice controls the nominating process through the imposition of onerous and vague requirements for candidacy, which ensures that Choice can carefully select all candidates. The elections to the CHOC board are thus noncompetitive.

269.    The collusion between CHOC and Choice is a fraudulent attempt to give a veneer of legitimacy to Choice's exploitative practices. Choice represents to Franchisees that they have the proverbial "voice at the table," when in fact Choice knows that CHOC functions as essentially a rubberstamp congress.

## G. Choice's Obstruction of the Termination Process

270.    Choice requires that Franchisees give notice of their intent to leave the franchise system during a narrow window of time approximately twelve months (or, in some cases, eighteen months) before the expiration of the franchise term. This is significantly more notice than the six months typically required in the industry.

271.    If a Franchisee misses this narrow notice window, they are unable to end their relationship without incurring the substantial liquidated damages described above.

272.    Even when a Franchisee properly gives notice, Choice schemes to prevent them from leaving in accordance with their contractual rights.

273.    Choice will send out inspectors to the franchise locations, whose mission is to determine that the franchise has violated one or another of the nebulous Rules and Regulation Choice unilaterally promulgates.

274.    Inspectors either identify or invent nominal violations of the Rules and Regulations, and Choice proceeds to asses substantial monetary penalties against Franchisees.

275.    In some instances, Choice uses these penalties and threats of default to improperly terminate the franchise agreement, and in other instances, it uses the penalties to keep franchisees from leaving the Choice system, due to the requirement that Franchisees pay all outstanding fees and penalties upon termination or expiration of the Agreements.

276.    Even if a Franchisee does not give notice, at times Choice will often preemptively audit them in order to assess penalties, making the future exercise of their termination rights more difficult.

277.    These audits are often arbitrary and result in invalid penalties.

278.    For example, after one audit, demanded back payments for allegedly unpaid room and booking fees.

279.    These allegedly unpaid room and booking fees were not in fact owed to Choice, because they were based on an intentional misreading of the audited Franchisee's books and records.

280.    The allegedly unpaid room and booking fees originate from guests who either cancelled their stay after booking, or were otherwise refunded. Essentially, Choice required this Franchisee to pay fees for non-paying rooms.

281.    In sum, the terms of the Franchise Agreements and Choice's "Rules and Regulations" (which Choice routinely updates and uses an extension of the Franchise Agreements in order to expand the terms of the original agreement, including but not limited to through the imposition of additional fees not specifically disclosed at the time of contracting) are in combination so burdensome to Franchisees and so one-sided in favor of Choice that they must be regarded as unconscionable and unenforceable.

## FACTUAL ALLEGATIONS COMMON TO THE CHOICE-CHOC RICO COUNTS, COUNTS I & II

### A.      Culpable Persons

282.    Choice and CHOC are both "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. §1962(c) in that each is a corporation capable of holding a legal interest in property.

283.    At all relevant times, Choice and CHOC were persons that existed separately and distinctly from the Enterprise, described below.

284.    Specifically, Choice, beyond its participation in the illegitimate affairs of the Enterprise, engages in the lawful business of entering into franchise agreements with hotel owners, and marketing its brands to the general public.

285.   CHOC, beyond its participation in the illegitimate affairs of the Enterprise, engages in the lawful business of organizing meetings between franchisees.

### B.      Enterprise

286.   Choice and CHOC constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. 1961(4) and 1962(c).

287.   Choice and CHOC are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing unlawful enterprise.

288.   Specifically, the Enterprise has a common goal of (a) fraudulently misrepresenting to Franchisees that CHOC represents their interests, in order to induce them into entering into the Agreements, (b) acquiring fraudulent monthly association fees, and (c) furthering Choice's scheme to economically exploit Franchisees.

289.   Choice and CHOC have an ongoing relationship with each other.

290.   Choice essentially handpicks CHOC's officers, who are then nominally approved by franchise owners in non-competitive elections.

291.   On information and belief, Choice dictates to CHOC board members what proposed measures they will approve, and in exchange offers substantial kickbacks to those board members, including preferential treatment in CHOC's reservation system.

### C.      Interstate Commerce

292.   The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

293.   Additionally, the activities of the Enterprise affect interstate commerce, in that they (a) induce Franchisees to enter into interstate Franchise Agreements, (b) cause monies, in the form of the association fees, to be transmitted in interstate commerce, and (c) affect other

-40-

fees, penalties, rules, and regulations imposed in interstate commerce upon Franchisees, and (d) cause Franchisees to pay elevated prices for Necessary Products to Qualified Vendors.

### D.      Pattern of Racketeering Activity

294.    Defendants, in knowingly conducting the affairs of the Enterprise, each committed at least two predicate acts that are indictable under the provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B) as more specifically alleged below. Defendants each committed at least two such acts or else aided and abetted such acts.

295.    The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous.

296.    Defendants participated in the operation and management of the Enterprise by overseeing and coordinating the commission of multiple acts of racketeering as described below.

297.    <u>Predicate Acts: Use of Mails and Wires to Defraud in violation of 18 U.S.C. § 1341 and § 1343.</u> Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1431,1343 in that they devised or intended to devise a scheme or artifice to defraud Franchisees and to obtain money from Franchisees by means of false or fraudulent pretenses, representations or promises.

298.    For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things by the U.S. mails or by private or commercial interstate carriers, or received such therefrom.

299.    Defendants also transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs, and signals.

300.    The acts of Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

301.    These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

302.    Defendants carried out their scheme in different states and could not have done so unless they used the U.S. mails or private or commercial interstate carriers or interstate wires.

303.    In furtherance of their scheme alleged herein, Defendants Choice and CHOC communicated among themselves and with Franchisees in furtherance of the scheme to defraud Franchisees.

304.    These communications were typically transmitted by wire and/or through the United States mails or private or commercial carriers.

305.    Specifically, Choice used interstate wires and/or the U.S. mail or private or commercial carriers to transmit copies of the Agreements to Franchisees.

306.    These Agreements contained the false representation that CHOC represented the interest of Franchisees.

307.    At the time these representations were made, Defendants knew them to be false, intended for Franchisees to rely upon them in entering into the Agreements and transmitting a monthly association fee, had a duty to disclose the truth, and acted with the intent to defraud Franchisees.

308.    Franchisees believed these false statements and reasonably acted in reliance upon these beliefs, to their detriment.

309.   Additionally, Defendants used interstate wires and/or the U.S. mail or private commercial carriers to transmit invoices to Franchisees for monthly association fees.

310.   Defendants' failure to reveal that CHOC did not represent the interest of Franchisees was a material omission.

311.   Defendants knew these omissions were false, intended for Franchisees to rely upon them in transmitting a monthly association fee, had a duty to disclose the truth, and acted with the intent to defraud Franchisees.

312.   Franchisees believed that no facts inconsistent with these omissions existed and reasonably relied upon that belief, to their detriment.

### COUNT I
### RICO, U.S.C. § 1962(c)
### (On behalf of all Plaintiffs, against Choice and CHOC)

313.   Plaintiffs incorporate by reference all the foregoing allegations as if set forth at length herein.

314.   As described above, Defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity intended to intentionally defraud Franchisees.

315.   As set forth above, Choice and CHOC agreed and conspired to violate 18 U.S.C. § 1962(c).

316.   Specifically, Choice and CHOC conspired to fraudulently represent to Franchisees that CHOC was a good faith representative of their interests in order to induce them into entering the Agreements and acquire from them a monthly association fee.

317.   In fact, CHOC operates as a rubberstamp for Choice's decisions, and CHOC's board members receive substantial non-monetary kickbacks from Choice.

318.   Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

319.   The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

320.   As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Franchisees have been injured in their business and property in that:

(a)   Franchisees were fraudulently induced to enter into the Agreements;

(b)   Franchisees were forced to pay a monthly association fee to CHOC, despite receiving no benefit from that fee;

(c)   Franchisees lost any financial benefits and concessions that a franchise association negotiating in good faith could have extracted from Choice.

321.   WHEREFORE, Franchisees are entitled to actual damages in an amount to be determined at trial, treble damages, and attorney's fees.

## COUNT II
### RICO § 1962(d)
**(On behalf of all Plaintiffs, against Choice and CHOC)**

322.   Plaintiffs incorporate by reference all the foregoing allegations as if set forth at length herein.

323.    As set forth above, Choice and CHOC agreed and conspired to violate 18 U.S.C. § 1962(c).

324.   Specifically, Choice and CHOC conspired to fraudulently represent to Franchisees that CHOC was a good faith representative of their interests in order to acquire from them a monthly association fee, when in fact CHOC operates as a rubberstamp for

Choice's decisions, and CHOC's board members receives monetary and non-monetary kickbacks from Choice.

325.   Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

326.   As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Franchisees have been injured in their business and property in that:

(a)   Franchisees were fraudulently induced to enter into the Agreement;

(b)   Franchisees were forced to pay a monthly association fee to CHOC, despite receiving no benefit from that fee;

(c)   Franchisees lost any financial benefits and concessions that a franchise association negotiating in good faith could have extracted from Choice.

327.   WHEREFORE, Franchisees are entitled to actual damages in an amount to be proven at trial, treble damages, and reasonable attorney's fees.

## FACTUAL ALLEGATIONS COMMON TO THE CHOICE-QUALIFIED VENDORS RICO COUNTS

### A.   Culpable Persons

328.   Choice is a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. §1962(c) in that it is a corporation capable of holding a legal interest in property.

329.   Non-parties, the Qualified Vendors, are persons within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. §1962(c), in that they are business entities capable of holding a legal interest in property.

-45-

330.    At all relevant times, Choice and the Qualified Vendors were persons that exist separate and distinct from the Enterprise, described below.

331.    Specifically, Choice, beyond its participation in the illegitimate affairs of the Enterprise, engages in the lawful business of entering into franchise agreements with hotel owners.

332.    The Qualified Vendors, beyond their participation in the illegitimate affairs of the Enterprise, engage in the lawful business of providing various goods and services to hoteliers and other businesses.

### B.    Enterprise

333.    Choice and the Qualified Vendors constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. 1961(4) and 1962(c).

334.    Choice and the Qualified Vendors are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing unlawful enterprise.

335.    Specifically, the Enterprise has a common goal of (a) fraudulently misrepresenting to Franchisees that Choice will only limit the number of Qualified Vendors for Necessary Products in order to secure a group discount or ensure adequate quality and supply to Choice's franchisees, in order to induce them into entering into the Agreements, (b) securing profits for Choice through the payment by Qualified Vendors of a kickback to Choice for the privilege of selling Necessary Products to Franchisees, and (c) securing profits for Qualified Vendors through the charging of grossly above-market rates to Franchisees for Necessary Products.

336.    Choice and the Qualified Vendors have an ongoing contractual relationship with each other. Choice and the Qualified Vendors enter into contracts with each other, whereby

each Qualified Vendor gains the right to sell Necessary Products to Franchisees, in exchange for a kickback to Choice.

### C.     Interstate Commerce

337.   The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

338.   The activities of the Enterprise affect interstate commerce, in that they (a) induce Franchisees to enter into interstate Franchise Agreements, (b) affect the prices of goods and services, which are sold in interstate commerce.

### D.     Pattern of Racketeering Activity

339.   Choice and the Qualified Vendors, in knowingly conducting the affairs of the Enterprise, each committed at least two predicate acts that are indictable under the provisions of the United States Code enumerated in 18 U.S.C. § 1961(1)(B) as more specifically alleged below.

340.   Choice and the Qualified Vendors each committed at least two such acts or else aided and abetted such acts.

341.   The acts of racketeering were not isolated, but rather the acts of Choice and the Qualified Vendors were related in that they had the same or similar purpose and result, participants, victims and method of commission.

342.   Further, the acts of racketeering by Choice and the Qualified Vendors have been continuous.

343.   Choice and he Qualified Vendors participated in the operation and management of the Enterprise by overseeing and coordinating the commission of multiple acts of racketeering as described below.

344.   Predicate Acts: Use of Mails and Wires to Defraud in violation of 18 U.S.C. §
1341 and § 1343. Choice and the Qualified Vendors committed acts constituting indictable
offenses under 18 U.S.C. §§ 1431,1343 in that they devised or intended to devise a scheme or
artifice to defraud Franchisees and to obtain money from Franchisees by means of false or
fraudulent pretenses, representations or promises.

345.   For the purpose of executing their scheme or artifice, Choice and the Qualified
Vendors caused delivery of various documents and things by the U.S. mails or by private or
commercial interstate carriers, or received such therefrom.

346.   Choice and the Qualified Vendors also transmitted or caused to be transmitted by
means of wire communications in interstate commerce various writings, signs, and signals.

347.   The acts of Defendants set forth above were done with knowledge that the use of
the mails or wires would follow in the ordinary course of business, or that such use could have
been foreseen, even if not actually intended.

348.   These acts were done intentionally and knowingly with the specific intent to
advance Defendants' scheme or artifice.

349.   Defendants carried out their scheme in different states and could not have done so
unless they used the U.S. mails or private or commercial interstate carriers or interstate wires.

350.   In furtherance of their scheme alleged herein, Defendants Choice and the
Qualified Vendors communicated among themselves and with Franchisees in furtherance of the
scheme to defraud Franchisees. These communications were typically transmitted by wire
and/or through the United States mails or private or commercial carriers.

351.   Specifically, Choice used interstate wires and/or the U.S. mail or private or
commercial carriers to transmit copies of the Agreements to Franchisees.

352.    These Agreements contained the false representation that Choice, in limiting the number of Qualified Vendors for Necessary Products, acted only to secure a group discount and/or to ensure adequate quality and supply across the brand.

353.    At the time these representations were made, Choice knew them to be false, intended for Franchisees to rely upon them in entering into the Agreements and agreeing to purchase Necessary Products only from Qualified Vendors, had a duty to disclose the truth, and acted with the intent to defraud Franchisees.

354.    Franchisees believed these false statements and reasonably acted in reliance upon these beliefs, to their detriment.

355.    Additionally, Choice and the Qualified Vendors used interstate wires and/or the U.S. mail or private commercial carriers to transmit invoices to Franchisees for the costs of Necessary Products.

356.    Choice and the Qualified Vendors' failure to reveal that Choice had made no attempt to secure group discounts or ensure adequate quality or supply was a material omission.

357.    Choice and the Qualified Vendors knew these omissions were false, intended for Franchisees to rely upon them in transmitting a monthly association fee, had a duty to disclose the truth, and acted with the intent to defraud Franchisees.

358.    Franchisees believed that no facts inconsistent with these omissions existed and reasonably relied upon that belief, to their detriment.

## COUNT III
### RICO § 1962(c)
### (On behalf of all Plaintiffs, against Choice)

359.    Plaintiffs incorporate by reference all the foregoing allegations as if set forth at length herein.

360.   As described above, Defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity intended to intentionally defraud Franchisees.

361.   As set forth above, Choice agreed and conspired to violate 18 U.S.C. § 1962(c).

362.   Specifically, Choice and the Qualified Vendors conspired to fraudulently represent to Franchisees that Choice limited the number of Qualified Vendors for Necessary Products only to secure a group discount or ensure adequate quality and supply, when in fact Choice was concerned only with gaining a substantial kickback from Qualified Vendors in exchange for extending to them the privilege of selling Necessary Products to Franchisees.

363.   Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

364.    The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

365.   As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Franchisees have been injured in their business and property in that:

(a)    Franchisees were fraudulently induced to enter into the Agreements;

(b)    Franchisees have been forced to pay above market prices for Necessary Products from Qualified Vendors;

366.   WHEREFORE, Franchisees pray that this Court enter an order in their favor against Choice for entitled to actual damages in an amount to be determined at trial, treble damages, and attorney's fees.

## COUNT IV
### RICO § 1962(d)
### (On behalf of all Plaintiffs, against Choice)

367.   Plaintiffs incorporate by reference all the foregoing allegations as if set forth at length herein.

368.   As set forth above, Choice agreed and conspired to violate 18 U.S.C. § 1962(c).

369.   Specifically, Choice and the Qualified Vendors conspired to fraudulently represent to Franchisees that Choice limited the number of Qualified Vendors for Necessary Products only to secure a group discount or ensure adequate quality and supply, when in fact Choice was concerned only with gaining a substantial kickback from Qualified Vendors in exchange for extending to them the privilege of selling Necessary Products to Franchisees.

370.   Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

371.   The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

372.   As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Franchisees have been injured in their business and property in that:

(a)     Franchisees were fraudulently induced to enter into the Agreements;

(b)     Franchisees have been forced to pay above market prices for Necessary Products from Qualified Vendors;

373.   WHEREFORE, Franchisees are entitled to actual damages in an amount to be proven at trial, treble damages, and reasonable attorney's fees.

**<u>COUNT V</u>**
**Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing**
**(On behalf of all Plaintiffs, and Marketing Cooperative Franchisees specifically, against Choice)**

374.    Plaintiffs incorporate by reference all of the foregoing allegations as if set forth at length herein.

375.    At all times relevant to this litigation, Defendant Choice was in individual contractual relationships with each Franchisee through the Franchise Agreements.

376.    Choice breached its obligations under the Agreement by, *inter alia*:

(a)    Limiting the number of Qualified Vendors of Essential Products not to "obtain volume discounts and to promote consistent quality and adequate supplies for the brand," (Agreement § 6(t)), but rather to maximize the financial kickbacks received by Choice from the Qualified Vendors;

(b)    Despite guaranteeing Franchisees' access to its reservation system in exchange for the payment of a "Systems Fee" (*Id.* §§ 4(b)(2), 19(h)), and representing to its investors that its contracts with OTAs constitute part of its reservation system, charging Franchisees a "Channel Management Fee" fee over and above the "Systems Fee" for access to OTA reservations;

(c)    Despite guaranteeing Franchisees' access to its reservation system in exchange for the payment of a "Systems Fee" (*Id.*), charging Franchisees a "Choice Hotels Enhanced Reservations Fee" to access booking through choicehotels.coms;

(d)    Diverting funds derived from Franchisees' marketing fees into Choice's own pockets;

(e)    Failing to provide Franchisees access to regional managers, despite charging Franchisees a fee for management;

(f)     Failing to provide all services and perform all obligations guaranteed under the Agreements;

377.   Due to Choice's ongoing breach of the Agreements, Franchisees have suffered monetary damages.

378.   Additionally, beyond the written terms of the Agreement, Choice owes a duty of good faith and fair dealing to Franchisees in relation to its performance under the Franchise Agreement and any related agreements.

379.   In its performance of the Franchise Agreements, Choice routinely violates its duty of good faith and fair dealing with its Franchisees, by, *inter alia*:

(a)     Instead of using the collective bargaining power of its Franchisees to negotiate discounted rates on products necessary to the operation of the hotels from Qualified Vendors, allowing—and effectively requiring—the Qualified Vendors to charge rates for Necessary Products well in excess of the market rate, by requiring the Qualified Vendors to pay large kickbacks ("rebates") to Choice in order to earn the privilege of doing business with Franchisees;

(b)     In negotiations with Qualified Vendors, prioritizing the size of the kickback a Qualified Vendor is willing to pay Choice over the securing of a group discount or ensuring high quality of Necessary Products;

(c)     Forcing Franchisees to use a specific credit card processor, Shift4 Payment, LLC, which honors customer chargebacks at a rate significantly higher than other credit card processors, causing Franchisees to lose significant monies in the form of fraudulent chargebacks;

(d)     Forcing Franchisees to purchase other Necessary Products from Qualified Vendors, when the Necessary Products provided by certain Qualified Vendors are of low quality and priced above a fair market rate;

(e)     Failing to provide Choice area managers to address Franchisees' concerns, or providing ineffective area managers;

(f)     Forcing Franchisees to pay an "association fee" to CHOC while actively working to undermine the efficacy of CHOC as a representative of Franchisee's interests;

(g)     Charging Franchisees a "Channel Management Fee" for access to reservations through Online Travel Agencies, over and above the disclosed "Systems Fee," which, under the terms of the Agreements, secured access to Choice's reservations system;

(h)     Despite guaranteeing Franchisees' access to its reservation system in exchange for the payment of a "Systems Fee" (*Id.*), charging Franchisees a "Choice Hotels Enhanced Reservations Fee" to access booking through choicehotels.coms;

(i)     Monetarily penalizing Franchisees for Choice's own mismanagement—for example, assessing penalties against Franchisees for guest's negative reviews of their hospitality experience, when those negative reviews stem from failures related to Choice's reservation system;

(j)     Monetarily penalizing Franchisees for their ratio of positive to negative guest reviews, while arbitrarily rejecting the validity of certain positive guest reviews;

(k)     Imposing or increasing fees to Franchisees for services, while at the same time decreasing the quality of those services—for example, increasing the amounts Franchisees must pay for customer service, while simultaneously off-shoring customer service to the Philippines, which has resulted in considerable difficulty for Franchisees due to the customer

service agents' generally low English proficiency, or increasing a management fee while simultaneously decreasing Franchisees' access to regional managers;

(l)     Refusing to negotiate in good faith with Franchisees in the wake of the Covid-19 pandemic;

(m)     Otherwise imposing onerous and unnecessary fees, penalties, and upon Franchisees;

(n)     Requiring Franchisees to pay up to 20% of their monthly revenue in fees and penalties, despite having previously represented to Franchisees that the fees would be approximately 7-10% of monthly revenue;

(o)     Otherwise acting to profit at the expense of Franchisees' financial health.

380.    Additionally, Marketing Cooperative Franchisees enter into side agreements with Choice, in which they agree that Choice will provide additional marketing and sales benefits in exchange for the payment by Marketing Cooperative Franchisees of additional fees. Choice never in fact provides any additional marketing or sales benefit to Marketing Cooperative Franchisees.

381.    Due to Choice's ongoing breach of contract and the implied covenant of good faith and fair dealing, Franchisees and Marketing Cooperative Franchisees have suffered damages in an amount to be determined at trial.

382.    WHEREFORE, Franchisees and Marketing Cooperative Franchisees seek to enforce the Agreement and recover consequential and/or compensatory damages in an amount to be determined at trial, or alternatively, terminate the Agreement due to Choice's material breaches and recover consequential and/or compensatory damages in an amount to be determined at trial.

<u>COUNT VI</u>
**Common Law Fraud**
**(On behalf of all Plaintiffs, and on behalf of Marketing Cooperative Franchisees**
**specifically, against Choice)**

383.   Plaintiffs incorporate by reference all the foregoing allegations as if set forth at length herein.

384.   As alleged above, Choice knowingly made false statements of fact to, and omitted or concealed true statements of fact from the Franchisees. Specifically, at the time each Franchisee entered into its individual Agreement with Choice, Choice and its representatives made the following false representations:

(a)   That CHOC, to whom Franchisees owed monthly association fees, would represent and advance the mutual interests of Choice and the Franchisees, when Choice knew that CHOC did not represent the interests of Franchisees;

(b)   That Choice would restrict the number of Qualified Vendors only to secure a group discount or to ensure adequate quality and supplies to its franchises, when Choice intended to restrict the number of Qualified Vendors for the primary purpose of securing kickbacks from the Qualified Vendors.

385.   Additionally, Choice has made a false representation to Franchisees on each and every time occasion it billed Franchisees for an association fee, when in fact it was aware that CHOC did not represent the interests of Franchisees.

386.   Additionally, on occasions uniquely in Choice's knowledge, on information and belief Choice falsely represented to Franchisees that it had obtained a discount on Franchisees' behalf from Qualified Vendors, and that it was thus entitled to withdraw monies from a marketing fund created by Franchisees, when in fact, Choice had obtained no discount, and in

fact received a rebate from Qualified Vendors for the transaction, which resulted in Franchisees paying inflated prices for the Necessary Products.

387.    Additionally, Choice, in entering into marketing cooperative agreements with Marketing Cooperative Franchisees, represented that it would provide Marketing Cooperative Franchisees with an additional marketing and sales benefit in exchange for the payment of additional fees to Choice.

388.    In fact, Choice never intended to provide any additional marketing and sales benefit to Marketing Cooperative Franchisees, and in fact never provides any additional benefit.

389.    Additionally, Choice represented and represents to Franchisees that it will provide certain services, including access to its reservation system, in exchange for payment of the Systems Fee, but in fact charged them additional fees for access to those services.

390.    Choice's statements and omissions were false, and Choice knew they were false at the time they were made.

391.    Choice owed a duty to each Franchisee and Marketing Cooperative Franchisee to disclose the truth of such omitted or concealed fact.

392.    Choice made the false statements, and engaged in the omissions and concealments, with the intent to defraud Franchisees and Marketing Cooperative Franchisees in order to induce them to rely on the statements and omissions.

393.    Each Franchisee and Marketing Cooperative Franchisee believed the false statements, or believed that no facts existed inconsistent with Defendant's omissions and concealments, and reasonably acted in reliance upon those beliefs, to their detriment.

394.    At all times relevant, Choice acted with malice and/or with reckless disregard as to the rights of Franchisees and Marketing Cooperative Franchisees.

395.    As a result of their detrimental reliance on Choice's fraudulent statements and omissions, Franchisees and Marketing Cooperative Franchisees have suffered monetary damages.

396.    WHEREFORE, Franchisees and Marketing Cooperative Franchisees seek to enforce the Agreement and recover consequential and/or compensatory damages in an amount to be determined at trial, or alternatively, terminate the agreement due to Choice's fraud and recover consequential and/or compensatory damages in an amount to be determined at trial.

**COUNT VII**
**Declaratory Judgment**
**(On behalf of all Plaintiffs, against Choice)**

397.    Plaintiffs incorporate by reference all the foregoing allegations as if set forth at length herein.

398.    As a condition of receiving the benefits of operating a Choice franchise, Choice uses its vastly superior bargaining power to require all Franchisees to accept the grossly unequal terms of the Agreements, which, as to many key provisions, is essentially a "take it or leave it" contract of adhesion .

399.    The following provisions of the Franchise Agreement (hereafter "the Unconscionable Provisions") together and/or individually are substantively unconscionable:

(a)    Choice's open-ended right to impose additional monthly fees and commissions on Franchisees not specifically disclosed at the time of contracting (Agreement §§ 4(b)(2), 6(a));

(b)    Choice's open-ended right to modify, at its sole discretion, the Rules and Regulations with which Franchisees must comply, upon pain of potential termination or suspension of franchising rights (*Id.* § 6(a));

(c)     A requirement that Franchisees join and pay monthly dues to CHOC, where Choice know, from the time of contracting, that CHOC consistently fails to make any substantive attempt to represent the interest of Franchisees (*Id.* § 6(n));

(d)     A requirement that Franchisees purchase certain products necessary for the operation of a hotel property ("Necessary Products") from vendors chosen by Choice ("Qualified Vendors"), from whom Choice can and does elicit kickbacks in the form of "rebates," which causes Franchisees to pay unnecessarily high, above-market prices for those products (*Id.* § 6(t));

(e)     Unequal termination clauses, which provides Choice a minimum of sixty days to cure any default under the Agreement, or longer if the default is not reasonably capable of being cured within that time frame (Agreement § 10(a)), but (i) provides Franchisees with a maximum of ten days, extendible at Choice's sole discretion, to cure any default related to the non-payment of fees due under the Agreement (*Id.* § 10(b)(1)(a)),  (ii) provides Franchisees with a maximum of thirty days, extendible at Choice's sole discretion, to cure other defaults (*Id.* § 10(b)(1)(b)), (iii) allows Choice to immediately terminate Franchisees under certain circumstances, including if the Franchisee violates a vague "loss of goodwill" provision (*Id.* §§ 10(b)(2)(b), (b)(l));

(f)     A provision providing for liquidated damages against Franchisees in the event of Franchisee's early termination of the Agreement, or Choice's termination of the Agreement due not Franchisee's alleged breach, but not providing for liquidated damages against Choice under any circumstances (*Id.* § 10(d)(2);

(g)     A provision requiring Franchisees to pay (i) all sums due to Choice immediately upon termination or expiration of the Agreement, which, when coupled with

Choice's broad right to require additional, not specifically disclosed, monthly fees, serves to prevent Franchisees from freely exiting the franchise system, and (ii) to pay Choice's damages and reasonable attorney's fees related to termination, but not providing for payment of Franchisee's damages and reasonable attorney's fees related to termination (*Id.* § 11(c));

   (h) A requirement that Franchisees broadly indemnify Choice, its affiliates, subsidiaries, officers, directors, agents, partners, and employees, and that Choice have exclusive control over any litigation in which Franchisee act as indemnitor, including the terms of settlement (*Id.* § 13);

   (i) An unequal mandatory arbitration provision, which (i) allows Choice to pursue certain claims arising out of the Agreement against Franchisees in a judicial forum, while not allowing Franchisees, under any circumstances, to bring an action for relief in a judicial forum against Choice for claims arising out of the Agreement; (ii) waives any right to pre-hearing discovery in a manner that, while technically mutually, inures to Choice's primary benefit,  (iii) requires the arbitration to physically occur in Choice's Maryland headquarters, regardless of the domicile of the Franchisee or the physical location of the Franchisee's hotel property or properties (*Id.* § 21);

   (j) A choice of law provision that chooses the law of Maryland to govern all claims, but while explicitly denying the right of Franchisees to rely upon  the choice of Maryland law to invoke the protections of Maryland's Franchise Registration and Disclosure Law, effectively putting non-Maryland franchisees outside of the protection of *any* state franchise practices act (*Id.* § 21);

   (k) A waiver of the right to bring a class or group action, which, while technically mutually, effectively inures to Choice's exclusive benefit (*Id.* § 22);

(l)     A waiver of the right to jury trial, which, while technically mutual, effectively inures to Choice's exclusive benefit (*Id.* § 23).

400.   The Franchise Agreements are procedurally unconscionable, because, at the inception of the Agreements, Choice used its vastly superior bargaining position to require Franchisees to accept the grossly unequal Unconscionable Terms outlined above.

401.   Specifically, as to the Unconscionable Terms, the Agreements are contracts of adhesion offered on a "take it or leave it" basis. The Unconscionable Terms are not subject to negotiation.

402.   Choice drafts the Agreements in their entirety.

403.   In the course of contracting, Choice and its representatives make misrepresentations upon which Franchisees reasonably rely, which at the time of contracting Choice and its representative knew to be materially false, including but not limited to:

(a)     The representation that it will limit the number of Qualified Vendors for Necessary Products solely for the purposes of securing group discounts and ensuring high quality, when in fact the primary aim of its negotiations with Qualified Vendors is to secure as large a kickback ("rebate") to Choice as possible;

(b)     The representation that the total fees Franchisees will be required to pay about 9% to 10% of their monthly revenue to Choice, when in fact, through additional undisclosed fees, Franchisees are required to pay as much as 20% of their monthly revenue to Choice;

(c)     The representation that CHOC will advance the mutual interests of Choice and Franchisees;

(d)    The representation that payment of a "System Fee" will secure Franchisees access to Choice's online reservation system, when Choice requires a "Channel Management Fee" to secure access to reservations through Online Travel Agencies ("OTAs"), despite the fact that Choice represents to its investors that the OTAs form part of its reservation system;

(e)    The representation that payment of a "System Fee" will secure Franchisees access to Choice's online reservation system, when Choice requires a "Choice Hotels Enhanced Reservation Program fee" to secure access to reservations through choicehotels.com.

404.   An actual, present, and justiciable controversy exists between Franchisees and Choice regarding the enforceability of the Unconscionable Provisions, because:

(a)    Choice continues to require Franchisees to purchase certain products at inflated rates from Qualified Vendors;

(b)    Choice continues to require Franchisees to pay arbitrary fees and penalties dues to its open-ended right to modify the Rules and Regulations with which Franchisees must comply;

(c)    Choice continues to impede Franchisees' free exit from the Franchise Agreement, by holding over Franchises' heads (i) its right to liquidated damage for early termination, and (ii) its right to unilaterally impose onerous and undisclosed fees and penalties upon Franchisees, which they must pay in full in order to exit the franchise system upon the expiration of the Agreements.

405.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Franchisees seeks declaratory judgment from this Court that the Unconscionable Provisions listed above are unconscionable, illusory, and/or unenforceable against Franchisees.

## COUNT VIII
### Violation of the Sherman Act, 15 U.S.C. § 1,
### (On behalf of all Plaintiffs, against Choice)

406.    Plaintiffs incorporate by reference all of the foregoing allegations as if set forth at length herein.

407.    There exists markets for ownership interests in Hospitality Franchises, in which Choice maintains substantial market power.

408.    A separate market exists for the related goods and services associated with the operations of Hospitality Franchises, including but not limited to services, software, physical furnishings, financial services, and food products (the "Necessary Products").

409.    Choice requires that Franchisees purchase some or all of the Necessary Products from vendors of its own choosing (the "Qualified Vendors").

410.    In order to obtain Choice's approval to sell Necessary Products to Franchisees, Choice requires Qualified Vendors to pay substantial kickbacks to Choice, which it refers to euphemistically as "rebates."

411.    Although Choice represents to Franchisees that, in limiting the number of Qualified Vendors from which Franchisees may purchase Necessary Products, it seeks only to obtain group discounts for Franchises and/or ensure consistent quality and adequate supplies for the franchise brand, in reality Choice chooses Qualified Vendors exclusively or primarily based upon how large a kickback those Qualified Vendors are willing to pay Choice.

412.   In actuality, the Necessary Products purchased from Qualified Vendors are often of inferior quality, and sold at above-market prices, relative to similar products sold by other vendors.

413.   While Choice does purport to give Franchisees the right to, at Choice's discretion, purchase Necessary Products from vendors other than the Qualified Vendors, in practice Choice rarely, if ever, grants Franchisees permission to do so.

414.   At the time they entered into the Agreements, Choice concealed the nature of its relationship with Qualified Vendor from Franchisees, in order to lock them into the onerous Agreements and create excessive switching costs.

415.   Choice also creates excessive switching costs through imposing onerous termination terms on Franchisees, such that upon termination or expiration of the Agreement, they may be liable to pay (1) liquidated damages and (2) all outstanding fees and penalties in full, which, by virtue of Choice's right under the Agreements to unilaterally impose additional fees and penalties, may be sufficient to prevent Franchisees from exercising their termination rights, locking them into the franchise system.

416.   At all times relevant Choice had monopoly power, market power, and/or economic power in the relevant Hospitality Franchise market, sufficient to force Franchisees to purchase and accept Necessary Products from Qualified Vendors.

417.   By reason of the terms of the Agreements and the investments Franchisees have made in their franchises, coupled with the difficulties Franchisees face in leaving the franchise system, Choice has substantial power in the market for both Hospitality Franchises and the market for Necessary Products.

418.    Choice manipulated its economic power in the Hospitality Franchise market to to coerce Franchisees to purchase Necessary Goods solely from Qualified Vendors, through contractual provisions contained in the Agreements, as well as exploitation of pre-contractual information deficiencies and post-contractual switching costs. Through these and other means, Choice can and does coerce Franchisees to purchase nearly of the Necessary Products from Qualified Vendors.

419.    Through the exercise of Choice's economic power as alleged herein, Choice has conditioned the purchase by Franchisees of their franchises and their continued existence as franchises upon the purchase of Necessary Products from Qualified Vendors.

420.    As a direct and proximate result of Choice's anti-competitive tying activity, Franchisees have been injured by being forced to pay above-market rates for inferior Necessary Products.

421.    A substantial amount of interstate commerce in Necessary Products has been adversely affected by Choice's actions. These actions impose an unreasonably negative effect on competition in the marketplace, because Choice's policy of coercing and condition the purchase and operation of a franchise and on purchase by Franchisees of Necessary Goods from Qualified Vendors forecloses the ability of vendors unwilling to pay kickbacks to Choice from selling their Necessary Products to Franchisees, even though the quality of such Necessary Products is equal to if not better than the quality of what is supplied by Qualified Vendors.

422.    Choice's tie of purchases of its franchises to purchase of Necessary Products from Qualified Vendors imposes an unreasonable restraint upon commerce and is therefore per se

unlawful in violation of Section One of the Sherman Act, 15 U.S.C. § 1, and has caused damage to Franchisees.

423.   Alternatively, if Choice's tying conduct is not *per se* unlawful, it is unlawful under the rule of reason, in that the anti-competitive consequences of Choice's conduct outweigh any pro-competitive effects thereof. Not only does Choice's conduct impose supra-competitive prices on Franchisees, it impedes the ability of other vendors to engage in competition with Qualified Vendors to provide high quality Necessary Products at lower costs. Moreover, consumers are injured in that they are forced to indirectly pay the kickbacks and excessive prices for products charged to franchises by Qualified Vendors. There is no pro-business or efficiency justification for the kickbacks and supra-competitive pricing, nor does any legitimate business purpose require these practices.

424.   WHEREFORE, Franchisees are entitled to damages in an amount to be proven at trial and then trebled pursuant to 15 U.S.C. § 15, permanent injunctive relief prohibiting Choice's unlawful tying conduct, and reasonable attorney's fees.

## COUNT IX
### Breach of Fiduciary Duty
### (On behalf of all Plaintiffs, against CHOC)

425.   Plaintiffs incorporate by reference all of the foregoing allegations as if set forth at length herein.

426.   Franchisees are required to pay monthly membership dues to CHOC, and are members of CHOC.

427.   CHOC assumed a fiduciary duty to represent the interests of its member Franchisees in negotiations with Choice, because:

(a)   CHOC represents in its mission statement to the Franchisees that its purposes are, *inter alia*, to "represent the Licensees of the Company through a unified voice,

protecting the greater interests of its members by providing ideas, advocacy programs, and services," and "[t]o assure that [Choice's] plans and policies enhance the best interest of the franchisees of the system." Choice Hotels Owners Council, *Missions and Objectives*, available at https://www.choiceowners.com/About-Uswe

      (b)     It accepts—and, in cooperation with Choice mandates—monthly fees from Franchisees, in the amount of $50.00 per hotel property, with the implied and/or explicit representation that these fees are in exchange for CHOC's faithful representation of the interests of the Franchisees.

      428.    CHOC routinely violates its duty of loyalty to Franchisees, in that its board members accept preferential treatment and other benefits from Choice in exchange for their compliance with and approval of onerous measures proposed by Choice, including but not limited to the imposition of new or increased fees on Franchisees, the imposition of new requirements and penalties through modification of the Terms and Conditions, and the entry into new agreements with Qualified Vendors that inure exclusively to the benefit of Choice while imposing onerous costs on Franchisees.

      429.    The kickbacks received by CHOC board members include, but are not limited to, algorithmic preferences in Choice's reservation system, such that their franchised properties appear higher in guests' hotel search results than the properties of other franchisees.

      430.    The CHOC board is utterly unresponsive to Franchisee's concerns with relation to franchising.

      431.    Franchisees have suffered damages due to CHOC's failure to loyally represent them in an amount to be determined at trial.

      432.    CHOC's actions and omissions were willful, outrageous, oppressive, and wanton.

433.   WHEREFORE, Franchisees are entitled to compensatory and punitive damages.

## COUNT X
### Violation of 42 U.S.C. § 1981
### (On behalf of all Plaintiffs, against Choice and CHOC)

434.   Plaintiffs incorporate by reference all of the foregoing allegations as if set forth at length herein.

435.   Choice Hoteliers, the owners of Franchisees, are members of protected classes due to their racial background and national origin (namely, Indian-American or other South Asian-American).

436.   Franchisees have standing to sue based on Choice and CHOC's discrimination against Choice Hoteliers, in that Franchisees have directly suffered damage due to the racial and national origin discrimination.

437.   Choice and CHOC have engaged in racial and national origin discrimination against Choice Hoteliers, causing harm to Franchisees, as evinced by, but not limited to, the following conduct:

(a)      Racially derogatory comments made by Choice executives in response to complaints raised by Franchisees about Choice's practices;

(b)      The stricter enforcement of Rules and Regulations against Franchisees than against franchises owned by white hoteliers—for example, Choice at one point decided that all Comfort Inn franchises that operated out of two-story buildings would have their franchise terminated, a rule that, on information and belief, (i) was aggressively enforced against franchises owned by Indian-Americans; (ii) was laxly enforced against franchises owned by white hoteliers; and (iii) was waived to allow the admission of certain white hoteliers who owned two-story buildings into the Comfort Inn franchise system;

(c)     The preferential advancement of key money to finance new hotel construction by franchises owned by white hoteliers, while providing substantially less, if any, key money to similarly situated Indian-American and South Asian-American who apply for it, including certain Franchisees.

(d)     The failure to honor regional exclusivity provisions negotiated by Indian-American and South Asian-American franchisees, including certain Franchisees, in order to allow the encroachment of franchises owned by white hoteliers upon Indian-American and South Asian-American franchise territory;

(e)     The endorsement and appointment of officers to CHOC in a discriminatory manner, as evidenced by the fact that CHOC's Regional Directors and Vice Directors as a group are over 60% white, despite the fact that South Asian hoteliers represent 75-85% of Choice's franchisees;

(f)     Other preferential treatment towards white hoteliers and discriminatory treatment towards Franchisees.

438.    By the conduct described above, Defendants intentionally and willfully deprived the above-named Franchisees of the same rights enjoyed by white citizens to the creation, performance, enjoyment, and all benefits of their contractual relationships with Defendants.

439.    As a result of Defendants' discriminatory behavior, Franchisees have suffered economic harm.

440.    In its discriminatory actions as alleged above, Defendants have acted with malice or reckless indifference to the rights of Franchisees.

441.   WHEREFORE, Franchisees are entitled to compensatory damages, punitive damages, permanent injunctive relief restraining Defendants from their discriminatory conduct, and to reasonable attorney's fees.

## COUNT XI
### Accounting
### (On behalf of all Plaintiffs, against Choice and CHOC)

442.   Plaintiffs incorporate by reference the foregoing allegations as if set forth at length herein.

443.   Choice owed Franchisees express contractual and common-law fiduciary duties of cart, information, and loyalty as a result of their franchisor-franchisee relationship under the Agreements.

444.   Defendant CHOC owed Franchisees express and common law fiduciary duties of care, obedience, information and loyalty as a result of its special position of trust and confidence, including as agent of Franchisees, to act in the best interests of Franchisees.

445.   Choices owes a duty to account for monies, including but not limited to:

(a)      An accounting of how it has spent monies taken from Franchisees that was ear-marked for marketing;

(b)      An accounting of the rebates it has taken from Qualified Vendors;

(c)      An accounting of its use of all other fees and penalties imposed upon Franchisees.

446.   CHOC owes a duty to account for monies, specifically its use of the monthly association fee provided by Franchisees.

447.   Upon information and belief, a request for such an accounting from either Choice or CHOC would be futile.

448.     Franchisees are unable to determine the amounts due to them without an accounting and there is no adequate remedy at law without such an accounting, or such legal remedies would be difficult, inadequate, or incomplete.

449.     WHEREFORE, Franchisees are entitled of an accounting of all fees paid by them to CHOC and Choice, and all rebate payments made to Choice by Qualified Vendors.

## COUNT XII
### Violations of New Jersey Franchise Practices Act
### (On behalf of New Jersey Franchisees, against Choice)

450.     Plaintiffs repeat and reallege each of the following paragraphs of the Complaint as if set forth at length herein.

451.     New Jersey Franchisees are franchisees within the meaning of N.J.S.A. § 56:10-3(d).

452.     Choice is a franchisor within the meaning of N.J.S.A. § 56:10-3(c).

453.     New Jersey Franchisees are, by the terms of their Franchise Agreements, required to perform business within the State of New Jersey.

454.     Under the New Jersey Franchise Practices Act, N.J.S.A. § 56:10-7 *et seq.*, a franchisor is prohibited from, *inter alia*:

(a)     Requiring "a franchisee at time of entering into a franchise arrangement to assent to a release, assignment, novation, waiver or estoppel, which would relieve any person from liability imposed by this act."

(b)     Prohibiting "directly or indirectly the right of free association among franchisees for any lawful purpose."

(c)     Imposing "unreasonable standards of performance upon a franchisee."

455.     Choice has effectively required New Jersey Franchisees to waive their rights under the New Jersey Franchise Practices Act, through:

(a)     Inserting into the Franchise Agreement a Maryland choice of law clause (Agreement § 21);

(b)     Inserting into the Franchise Agreement the following language: "[N]othing herein shall be construed to establish independently your right to pursue claims under Maryland's Franchise Registration and Disclosure Law," which, in combination with the foregoing choice of law clause, effectively purports to put the Franchise Agreement beyond the reach of *any* state's franchise act (*Id.*);

(c)     Requiring New Jersey Franchisees to submit to binding arbitration (*Id.*);

(d)     Requiring New Jersey Franchisees to waive their right to participate in a class action suit or jury trial (*Id.* §§ 22, 23).

456.   Choice has effectively prohibited the right of free association among Franchisees, by requiring them to pay fees to CHOC, which they actively seek to corrupt and render ineffective as a representative of Franchisees' interests;

(a)     Requiring New Jersey Franchisees to submit to binding arbitration (*Id.*);

(b)     Requiring New Jersey Franchisees to waive their right to participate in a class action suit or jury trial (*Id.* §§ 22, 23).

457.   Choice has effectively prohibited the right of free association among Franchisees, by requiring them to pay fees to CHOC, which they actively seek to corrupt and render ineffective as a representative of Franchisees' interests.

458.   Choice has held New Jersey Franchisees to unreasonable standards of performance, by, *inter alia*:

(a)     Requiring New Jersey Franchisees to pay above-market prices for Necessary Products from Qualified Vendors;

(b)     Requiring New Jersey Franchisees to purchase Necessary Products from Qualified Vendors that are inferior in quality to similar products offered by their competitors;

(c)     Requiring New Jersey Franchisees to pay undisclosed fees and penalties to Choice, such that the total fees and penalties paid by each individual Franchisee could approach, equal, or even exceed 20% of monthly revenue;

(d)     Adding onerous rules to Choice's Rules and Regulations;

(e)     Failing to provide Choice area managers to address New Jersey Franchisees' concerns, or providing ineffective area managers;

(f)     Forcing New Jersey Franchisees to pay an "association fee" to CHOC while actively working to undermine the efficacy of CHOC as a representative of Franchisee's interests;

(g)     Charging New Jersey Franchisees a "Channel Management Fee" for access to reservations through Online Travel Agencies, over and above the disclosed "Systems Fee," which, under the terms of the Agreements, secured access to Choice's reservations system;

(h)     Monetarily penalizing New Jersey Franchisees for Choice's own mismanagement—for example, assessing penalties against Franchisees for guest's negative reviews of their hospitality experience, when those negative reviews stem from failures related to Choice's reservation system;

459.   As a direct and proximate result of Choice's actions, Franchisees have suffered damages.

460.   WHEREFORE, Plaintiff requests that this Court enter judgment in Franchisees' favor against Choice as follows: for actual damages in an amount to be determined at trial,

injunctive relief restraining Choice from continuing to perform acts in violation of the New Jersey Franchise Practices Act, and reasonable attorney's fees.

**COUNT XII**
**Violations of New York State Franchise Act**
**(On behalf of New York Franchisees, against Choice)**

461.   Plaintiffs repeat and reallege each of the following paragraphs of the Complaint as if set forth at length herein.

462.   New York Franchisees are franchisees within the meaning of N.Y. Gen. Bus. § 681(4).

463.   Choice is a franchisor within the meaning of N.Y. Gen. Bus. § 681(5).

464.    New York Franchisees are, by the terms of their Franchise Agreements, required to perform business within the State of New York.

465.   Under the New York Franchise Act, N.Y. Gen. Law. § 687, a franchisor is prohibited from, *inter alia*:

(a)     Making "any untrue statement of a material fact in any application, notice, statement, prospectus or report filed with the department under this article, or willfully to omit to state in any such application, notice, statement, prospectus or report any material fact which is required to be stated therein, or to fail to notify the department of any material change as required by this article."

(b)     Employing "any device, scheme, or artifice to defraud."

(c)     Making an "untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

(d)     Engaging in "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

-74-

(e)      Requiring a franchisee "to assent to a release, assignment, novation, waiver or estoppel which would relieve a person from any duty or liability imposed by this article."

466.   Additionally, the act voids any "condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this law, or rule promulgated hereunder."

467.   Choice has effectively required New York Franchisees to waive their rights under the New York Franchises Act, through:

(a)      Inserting into the Franchise Agreement a Maryland choice of law clause (Agreement § 21);

(b)      Inserting into the Franchise Agreement the following language: "[N]othing herein shall be construed to establish independently your right to pursue claims under Maryland's Franchise Registration and Disclosure Law," which, in combination with the foregoing choice of law clause, effectively purports to put the Franchise Agreement beyond the reach of *any* state's franchise act (*Id.*);

(c)      Requiring New York Franchisees to submit to binding arbitration (*Id.*);

(d)      Requiring New York Franchisees to waive their right to participate in a class action suit or jury trial (*Id.* §§ 22, 23).

468.   As alleged above, Choice acted fraudulently, intentionally made misstatements of material fact, and acted pursuant to a scheme to defraud New York franchisees by making the following false representations:

(a)      That CHOC, to whom New York Franchisees owed monthly association fees, would represent and advance the mutual interests of Choice and the New York Franchisees, when Choice knew that CHOC did not represent the interests of New York Franchisees;

(b)      That Choice would restrict the number of Qualified Vendors only to secure a group discount or to ensure adequate quality and supplies to its franchises, when Choice intended to restrict the number of Qualified Vendors for the primary purpose of securing kickbacks from the Qualified Vendors.

469.   Additionally, Choice has made a false representation to New York Franchisees on each and every time occasion it billed New York Franchisees for an association fee, when in fact it was aware that CHOC did not represent the interests of New York Franchisees.

470.   Additionally, on occasions uniquely in Choice's knowledge, on information and belief Choice falsely represented to New York Franchisees that it had obtained a discount on New York Franchisees' behalf from Qualified Vendors, and that it was thus entitled to withdraw monies from a marketing fund created by New York Franchisees, when in fact, Choice had obtained no discount, and in fact received a rebate from Qualified Vendors for the transaction, which resulted in Franchisees paying inflated prices for the Necessary Products.

471.   Additionally, Choice represents to New York Franchisees that it will provide certain services, including access to its reservation system, in exchange for payment of the Systems Fee, but in fact charged them additional fees for access to those services.

472.   Choice's statements and omissions were false, and Choice knew they were false at the time they were made.

473.   Choice owed a duty to each New York Franchisee to disclose the truth of such omitted or concealed fact.

474.   Choice made the false statements, and engaged in the omissions and concealments, with the intent to defraud New York Franchisees in order to induce them to rely on the statements and omissions.

475.   Each New York Franchisee believed the false statements, or believed that no facts existed inconsistent with Defendant's omissions and concealments, and reasonably acted in reliance upon those beliefs, to their detriment.

476.   At all times relevant, Choice acted with malice and/or with reckless disregard as to the rights of New York Franchisees.

477.   Choice's actions were willful and material.

478.   As a direct and proximate result of Choice's actions, Franchisees have suffered damages.

479.   WHEREFORE, Plaintiff requests that this Court enter judgment in Franchisees' favor against Choice as follows: for actual damages in an amount to be determined at trial, for rescission as provided by N.Y. GBS § 691(1), damages with interest at 6% per year from the date of purchase, and reasonable attorney's fees and court costs.

## COUNT XIII
### Violations of Florida State Franchise Act
### (On behalf of Florida Franchisees, against Choice)

480.   Plaintiffs repeat and reallege each of the following paragraphs of the Complaint as if set forth at length herein.

481.   Florida Franchisees are a franchisees within the meaning of Fla. Stat. § 817.416(2).

482.   Choice is a franchisor within the meaning of Fla. Stat. § 817.416(3).

483.    Florida Franchisees, by the terms of their Franchise Agreements, required to perform business within the State of Florida.

484.   Under the Florida Franchise Act, N.Y. Gen. Law. . § 817.416(2)*,* a franchisor is prohibited from, *inter alia*: intentionally misrepresenting, "by failure to disclose or otherwise, the known required total investment for such franchise or distributorship."

485.   As alleged above, Choice acted fraudulently, intentionally failed to disclose the known required total investment required of Florida Franchisees by making the following false representations:

(a)     That CHOC, to whom Florida Franchisees owed monthly association fees, would represent and advance the mutual interests of Choice and Florida Franchisees, when Choice knew that CHOC did not represent the interests of Florida Franchisees;

(b)     That Choice would restrict the number of Qualified Vendors only to secure a group discount or to ensure adequate quality and supplies to its franchises, when Choice intended to restrict the number of Qualified Vendors for the primary purpose of securing kickbacks from the Qualified Vendors.

486.   Additionally, Choice has made a false representation to Florida Franchisees on each and every time occasion it billed Florida Franchisees for an association fee, when in fact it was aware that CHOC did not represent the interests of Florida Franchisees.

487.   Additionally, on occasions uniquely in Choice's knowledge, on information and belief Choice falsely represented to Florida Franchisees that it had obtained a discount on Florida Franchisees' behalf from Qualified Vendors, and that it was thus entitled to withdraw monies from a marketing fund created by Florida Franchisees, when in fact, Choice had obtained no discount, and in fact received a rebate from Qualified Vendors for the transaction, which resulted in Florida Franchisees paying inflated prices for the Necessary Products.

488.   Additionally, Choice represents to Florida Franchisees that it will provide certain services, including access to its reservation system, in exchange for payment of the Systems Fee, but in fact charged them additional fees for access to those services.

489.   Choice's statements and omissions were false, and Choice knew they were false at the time they were made.

490.   Choice owed a duty to each Florida Franchisee to disclose the truth of such omitted or concealed fact.

491.   As a direct and proximate result of Choice's actions, Florida Franchisees have suffered damages.

492.   WHEREFORE, Plaintiff requests that this Court enter judgment in Florida Franchisees' favor against Choice as follows: for all monies invested into the Franchise, and for reasonable attorney's fees and court costs.

## COUNT XIV
### Violations of Maryland Franchisees Law
### (On behalf of Maryland Franchisees, and, in the alternative, Franchisees, against Choice)

493.   Plaintiffs repeat and reallege each of the following paragraphs of the Complaint as if set forth at length herein.

494.   This count is brought on behalf of Maryland Franchisees, and in the alternative on behalf of all Franchisees, in the event that this Court finds that all or some of their franchise agreements are governed by Maryland law.

495.   The Maryland Franchisees and the Franchisees are a franchisee within the meaning of Md. Bus. Reg. Code Ann. § 14-201(g).

496.   Choice is a franchisor within the meaning of Md. Bus. Reg. Code Ann. § 14-201(h).

497.    Maryland Franchisees are, by the terms of their Franchise Agreements, required to perform business within the State of Maryland.

498.    All Franchisees are, by the terms of their Franchise Agreements, required to submit to a Maryland choice of law clause.

499.    Under the Maryland Franchise Law § 14-227, a franchisor is prohibited from, *inter alia*: offering to sell or selling a franchise "by means of an untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, if the person who buys or is granted a franchise does not know of the untruth or omission intentionally misrepresenting."

500.    As alleged above, Choice acted fraudulently, and intentionally failed to disclose the known required total investment required of Maryland Franchisees and Franchisees making the following false representations:

(a)    That CHOC, to whom Maryland Franchisees and Franchisees owed monthly association fees, would represent and advance the mutual interests of Choice and the Maryland Franchisees and Franchisees, when Choice knew that CHOC did not represent the interests of Maryland Franchisees and Franchisees;

(b)    That Choice would restrict the number of Qualified Vendors only to secure a group discount or to ensure adequate quality and supplies to its franchises, when Choice intended to restrict the number of Qualified Vendors for the primary purpose of securing kickbacks from the Qualified Vendors.

501.    Additionally, Choice made a false representation to Maryland Franchisees and Franchisees on each and every time occasion it billed Maryland Franchisees and Franchisees for

an association fee, when in fact it was aware that CHOC did not represent the interests of Maryland Franchisees or Franchisees.

502.    Additionally, on occasions uniquely in Choice's knowledge, on information and belief Choice falsely represented to Maryland Franchisees and Franchisees that it had obtained a discount on Maryland Franchisees and Franchisee's behalf from Qualified Vendors, and that it was thus entitled to withdraw monies from a marketing fund created by Maryland Franchisees and Franchisees, when in fact, Choice had obtained no discount, and in fact received a rebate from Qualified Vendors for the transaction, which resulted in Maryland Franchisees and Franchisees paying inflated prices for the Necessary Products.

503.    Additionally, Choice represents to Maryland Franchisees and Franchisees, LLC that it will provide certain services, including access to its reservation system, in exchange for payment of the Systems Fee, but in fact charged them additional fees for access to those services.

504.    Choice's statements and omissions were false, and Choice knew they were false at the time they were made.

505.    Maryland Franchisees and Franchisees did not know these statements and omissions were false.

506.    Choice owed a duty to Maryland Franchisees and Franchisees to disclose the truth of such omitted or concealed fact.

507.    Choice's false statements and omissions induced Maryland Franchisees and Franchisees to purchase Choice franchises.

508.    As a direct and proximate result of Choice's actions, Maryland Franchisees and Franchisees have suffered damages.

509.   WHEREFORE, Plaintiff requests that this Court: enter judgment in Franchisees and Maryland Franchisees' favor against Choice for damages in an amount to be determined at trial; to enter an order for restitution and to rescind their franchise agreements, and to enter an order for reasonable attorney's fees and court costs.

<u>COUNT XV</u>
**Violations of Michigan Franchise Investment Law**
**(On behalf of Mahamati Inc. against Choice)**

510.   Plaintiffs repeat and reallege each of the following paragraphs of the Complaint as if set forth at length herein.

511.   Choice is a franchisor within the meaning of Mich. Comp. Law § 445.1502(5).

512.   Mahamati Inc. is a franchisee within the meaning of Mich. Com. Law § 445.1502(4).

513.   Mahamati Inc., by the terms of its Franchise Agreement, is required to perform business within the State of Michigan.

514.   Under the Michigan Franchise Investment Law, Mich. Com.  Law § 445.1505, a franchisor is prohibited, in connection with any purchase or sale of a franchise, from *inter alia*:

(a)     Employing "any device, scheme, or artifice to defraud";

(b)     Making "any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading";

(c)     Engaging "in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

515.   As alleged above, Choice acted fraudulently, and made untrue statements of material fact and omitted material facts that, in their absence, made statements misleading, by making to Mahamati Inc. the following false representations:

-82-

(a)     That CHOC, to whom Mahamati Inc. owed monthly association fees, would represent and advance the mutual interests of Choice and Mahamati Inc, when Choice knew that CHOC did not represent the interests of Mahamati Inc.;

(b)     That Choice would restrict the number of Qualified Vendors only to secure a group discount or to ensure adequate quality and supplies to its franchises, when Choice intended to restrict the number of Qualified Vendors for the primary purpose of securing kickbacks from the Qualified Vendors.

516.   Additionally, Choice has made a false representation to Mahamati Inc. on each and every time occasion it billed Mahamati Inc. and Franchisees for an association fee, when in fact it was aware that CHOC did not represent the interests of Maryland Franchisees or Franchisees.

517.   Additionally, on occasions uniquely in Choice's knowledge, on information and belief Choice falsely represented to Mahamati Inc. that it had obtained a discount on Mahamati Inc.'s behalf from Qualified Vendors, and that it was thus entitled to withdraw monies from a marketing fund created by Mahamati Inc., when in fact, Choice had obtained no discount, and in fact received a rebate from Qualified Vendors for the transaction, which resulted in Maryland Franchisees and Franchisees paying inflated prices for the Necessary Products.

518.   Additionally, Choice represents to Mahamati Inc. that it will provide certain services, including access to its reservation system, in exchange for payment of the Systems Fee, but in fact charged them additional fees for access to those services.

519.   Choices representations and omissions were false, and Choice was aware of their falsity at the time they were made.

520.    Mahamati Inc. did not know these representations and omissions were false, and acted on reasonable reliance of them. .

521.    As a direct and proximate result of Choice's actions, Mahamati Inc. has suffered damages.

522.    WHEREFORE, Plaintiff requests that this Court: enter judgment in Franchisees and Mahamati Inc.'s favor against Choice for damages in an amount to be determined at trial; 12% annual interest upon damages; and for reasonable attorney's fees and court costs.

**COUNT XVI**
**Violations of Minnesota Franchise Statute**
**(On behalf of DC Hotels LLC, against Choice)**

523.    Plaintiffs repeat and reallege each of the following paragraphs of the Complaint as if set forth at length herein.

524.    Choice is a franchisor within the meaning of Minn. STAT § 80C.01(6).

525.    DC Hotels, LLC is a franchisee within the meaning of Minn. STAT § 80C.01(5).

526.    DC Hotels, LLC, by the terms of its Franchise Agreement, is required to perform business within the State of Minnesota.

527.    Under the Minnesota Franchise Statute, Minn. STAT § 80C.13, a franchisor is prohibited, in connection with any purchase or sale of a franchise, from *inter alia*:

(a)    Employing "any device, scheme, or artifice to defraud";

(b)    Making "any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading";

(c)    Engaging "in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

528.    As alleged above, Choice acted fraudulently, and made untrue statements of material fact and omitted material facts that, in their absence, made statements misleading, by making to DC Hotels, LLC. the following false representations:

(a)    That CHOC, to whom DC Hotels, LLC. owed monthly association fees, would represent and advance the mutual interests of Choice and DC Hotels, LLC, when Choice knew that CHOC did not represent the interests of DC Hotels, LLC.;

(b)    That Choice would restrict the number of Qualified Vendors only to secure a group discount or to ensure adequate quality and supplies to its franchises, when Choice intended to restrict the number of Qualified Vendors for the primary purpose of securing kickbacks from the Qualified Vendors.

529.    Additionally, Choice has made a false representation to DC Hotels, LLC. on each and every time occasion it billed DC Hotels, LLC for an association fee, when in fact it was aware that CHOC did not represent the interests of DC Hotels, LLC.

530.    Additionally, on occasions uniquely in Choice's knowledge, on information and belief Choice falsely represented to DC Hotels, LLC that it had obtained a discount on DC Hotel's behalf from Qualified Vendors, and that it was thus entitled to withdraw monies from a marketing fund created by Mahamati Inc., when in fact, Choice had obtained no discount, and in fact received a rebate from Qualified Vendors for the transaction, which resulted in DC Hotels LLC paying inflated prices for the Necessary Products.

531.    Additionally, Choice represents to DC Hotels, LLC. that it will provide certain services, including access to its reservation system, in exchange for payment of the Systems Fee, but in fact charged them additional fees for access to those services.

532.    Choices representations and omissions were false, and Choice was aware of their falsity at the time they were made.

533.    DC Hotels, LLC did not know these representations and omissions were  false, and acted on reasonable reliance of them. .

534.    As a direct and proximate result of Choice's actions, DC Hotels LLC has suffered damages.

535.    WHEREFORE, Plaintiff requests that this Court: enter judgment in DC Hotels LLC's favor against Choice for damages in an amount to be determined at trial and for reasonable attorney's fees and court costs.

**COUNT XVII**
**Violations of North Dakota Franchise Investment Law**
**(On behalf of Highmark Lodging LLC, against Choice)**

536.    Plaintiffs repeat and reallege each of the following paragraphs of the Complaint as if set forth at length herein.

537.    Choice is a franchisor within the meaning of N.D.C.C. § 51-19-02(8).

538.    Highmark Lodging LLC is a franchisee within the meaning of N.D.C.C. § 51-19-02(7).

539.    Highmark Lodging LLC, by the terms of its Franchise Agreement, is required to perform business within the State of North Dakota.

540.    Under the North Dakota Franchise Investment Law, N.D.C.C § 51-19-11, a franchisor is prohibited, in connection with any purchase or sale of a franchise, from *inter alia*:

(a)    Employing "any device, scheme, or artifice to defraud";

(b)    Making "any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading";

(c)     Engaging "in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

541.   As alleged above, Choice acted fraudulently, and made untrue statements of material fact and omitted material facts that, in their absence, made statements misleading, by making to Highmark Lodging LLC the following false representations:

(a)     That CHOC, to whom Highmark Lodging LLC owed monthly association fees, would represent and advance the mutual interests of Choice and Highmark Lodging LLC, when Choice knew that CHOC did not represent the interests of Highmark Lodging LLC;

(b)     That Choice would restrict the number of Qualified Vendors only to secure a group discount or to ensure adequate quality and supplies to its franchises, when Choice intended to restrict the number of Qualified Vendors for the primary purpose of securing kickbacks from the Qualified Vendors.

542.   Additionally, Choice has made a false representation to Highmark Lodging LLC on each and every time occasion it billed Highmark Lodging LLC for an association fee, when in fact it was aware that CHOC did not represent the interests of Highmark Lodging LLC.

543.   Additionally, on occasions uniquely in Choice's knowledge, on information and belief Choice falsely represented to Highmark Lodging LLC that it had obtained a discount on Highmark Lodging LLC's behalf from Qualified Vendors, and that it was thus entitled to withdraw monies from a marketing fund created by Highmark Lodging LLC., when in fact, Choice had obtained no discount, and in fact received a rebate from Qualified Vendors for the transaction, which resulted in Highmark Lodging LLC paying inflated prices for the Necessary Products.

544.    Additionally, Choice represents to Highmark Lodging LLC that it will provide certain services, including access to its reservation system, in exchange for payment of the Systems Fee, but in fact charged them additional fees for access to those services.

545.    Choices representations and omissions were false, and Choice was aware of their falsity at the time they were made.

546.    Highmark Lodging LLC did not know these representations and omissions were false, and acted on reasonable reliance of them. .

547.    As a direct and proximate result of Choice's actions, Highmark Lodging LLC has suffered damages.

548.    WHEREFORE, Plaintiff requests that this Court: enter judgment in Franchisees and Highmark Lodging LLC's favor against Choice for damages in an amount to be determined at trial; rescission of contract; and for reasonable attorney's fees and court costs.

## COUNT XII
### Violations of Illinois Franchise Registration Disclosure Act
### (On behalf of Yashmira LLC, against Choice)

549.    Plaintiffs repeat and reallege each of the following paragraphs of the Complaint as if set forth at length herein.

550.    Yashmira LLC is a franchisee within the meaning of 815 ILCS 705/3(2).

551.    Choice is a franchisor within the meaning of 815 ILCS 705/3(3).

552.     Yashmira LLC is, by the terms of its Franchise Agreement, required to perform business within the State of Illinois.

553.    Under the Illinois Franchise Registration Disclosure Act, 815 ILCS 705/6), a franchisor is prohibited from, *inter alia*:

(a)     Making "any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."

(b)     Employing "any device, scheme, or artifice to defraud."

(c)     Engaging in "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

554.    Additionally, the act voids any "condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this law, or rule promulgated hereunder."

555.    Choice has effectively required Yashmira LLC to waive its rights under the New York Franchises Act, through:

(a)     Inserting into the Franchise Agreement a Maryland choice of law clause (Agreement § 21);

(b)     Inserting into the Franchise Agreement the following language: "[N]othing herein shall be construed to establish independently your right to pursue claims under Maryland's Franchise Registration and Disclosure Law," which, in combination with the foregoing choice of law clause, effectively purports to put the Franchise Agreement beyond the reach of *any* state's franchise act (*Id.*);

(c)     Requiring Yashmira LLC to submit to binding arbitration (*Id.*);

(d)     Requiring Yashmira LLC to waive their right to participate in a class action suit or jury trial (*Id.* §§ 22, 23).

556.   As alleged above, Choice acted fraudulently, intentionally made misstatements of material fact, and acted pursuant to a scheme to defraud Yashmira LLC by making the following false representations:

(a)   That CHOC, to whom Yashmira LLC owed monthly association fees, would represent and advance the mutual interests of Choice and the Yashmira LLC, when Choice knew that CHOC did not represent the interests of Yashmira LLC;

(b)   That Choice would restrict the number of Qualified Vendors only to secure a group discount or to ensure adequate quality and supplies to its franchises, when Choice intended to restrict the number of Qualified Vendors for the primary purpose of securing kickbacks from the Qualified Vendors.

557.   Additionally, Choice has made a false representation to Yashmira LLC on each and every time occasion it billed Yashmira LLC for an association fee, when in fact it was aware that CHOC did not represent the interests of New York Franchisees.

558.   Additionally, on occasions uniquely in Choice's knowledge, on information and belief Choice falsely represented to Yashmira LLC that it had obtained a discount on Yashmira LLC's  behalf from Qualified Vendors, and that it was thus entitled to withdraw monies from a marketing fund created by New York Franchisees, when in fact, Choice had obtained no discount, and in fact received a rebate from Qualified Vendors for the transaction, which resulted in Franchisees paying inflated prices for the Necessary Products.

559.   Additionally, Choice represents to Yashmira LLC that it will provide certain services, including access to its reservation system, in exchange for payment of the Systems Fee, but in fact charged them additional fees for access to those services.

560.   Choice's statements and omissions were false, and Choice knew they were false at the time they were made.

561.   Choice owed a duty to Yashmira LLC to disclose the truth of such omitted or concealed fact.

562.   Choice made the false statements, and engaged in the omissions and concealments, with the intent to defraud Yashmira LLC in order to induce them to rely on the statements and omissions.

563.   Yashmira LLC believed the false statements, or believed that no facts existed inconsistent with Defendant's omissions and concealments, and reasonably acted in reliance upon those beliefs, to their detriment.

564.   At all times relevant, Choice acted with malice and/or with reckless disregard as to the rights of Yashmira LLC.

565.   Yashmira LLC's actions were willful and material.

566.   As a direct and proximate result of Choice's actions, Franchisees have suffered damages.

567.   WHEREFORE, Plaintiff requests that this Court enter judgment in Franchisees' favor against Choice as follows: for actual damages in an amount to be determined at trial, for costs, and reasonable attorney's fees.

## COUNT XIX
### Violations of Indiana Deceptive Franchise Practices Act
### (On behalf of Indiana Franchisees, against Choice)

568.   Plaintiffs repeat and reallege each of the following paragraphs of the Complaint as if set forth at length herein.

569.    Indiana Franchisees are, by the terms of their Franchise Agreements, required to perform business within the State of Indiana.

570.    Under IC 23-2-2.7-1 and IC 23-2-2.7-2,, a franchisor is prohibited from, *inter alia*:

(a)    "Requiring goods, supplies, inventories, or services to be purchased exclusively from the franchisor where such goods, supplies, inventories, or services of comparable quality are available from sources other than those designated by the franchisor."

(b)    Entering into an agreement "[a]llowing substantial modification of the franchise agreement by the franchisor without the consent in writing of the franchisee."

(c)    Obtaining "money, goods, services, or any other benefit from any other person with whom the franchisee does business, on account of, or in relation to, the transaction between the franchisee and the other person, other than for compensation for services rendered by the franchisor, unless the benefit is promptly accounted for, and transmitted to the franchisee."

(d)    "Permitting the franchisor to fail to renew a franchise without good cause or in bad faith."

(e)    Limiting litigation brought for breach of the agreement in any matter whatsoever.

(f)    Engaging in "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

(g)    Requiring a franchisee "to assent to a release, assignment, novation, waiver or estoppel which would relieve a person from any duty or liability imposed by this article."

       (h)     Coercing the franchisee "to order or accept delivery of any goods, supplies, inventories or services which are neither necessary to the operation of the franchise, required by the franchise agreement, required by law, nor voluntarily ordered by the franchisee."

       (i)     "Discriminating unfairly among its franchisees."

571.   Choice has effectively restricted the rights of Indiana Franchisees to pursue litigation by:

       (a)     Inserting into the Franchise Agreement a Maryland choice of law clause (Agreement § 21);

       (b)     Inserting into the Franchise Agreement the following language: "[N]othing herein shall be construed to establish independently your right to pursue claims under Maryland's Franchise Registration and Disclosure Law," which, in combination with the foregoing choice of law clause, effectively purports to put the Franchise Agreement beyond the reach of *any* state's franchise act (*Id.*);

       (c)     Requiring Indiana Franchisees to submit to binding arbitration (*Id.*);

       (d)     Requiring Indiana Franchisees to waive their right to participate in a class action suit or jury trial (*Id.* §§ 22, 23).

572.   As alleged above, Choice has required Indiana franchisees to purchase goods and services from Qualified Vendors when comparable goods and services were available.

573.   As alleged above, Choice receives monies from Qualified Vendors in connection with their transactions with Indiana Franchisees.

574.   As alleged above, Choice arbitrarily changes Indiana Franchisees' obligations under the Franchise Agreement.

-93-

575.   As alleged above, Choice discriminates against Indian American and South Asian hoteliers.

576.   As alleged above, Choice requires Indiana Franchisees to pay for unnecessary goods and services.

577.   WHEREFORE, Plaintiff requests that this Court enter judgment in Franchisees' favor against Choice as follows: for actual damages in an amount to be determined at trial.

**COUNT XX**
**Violations of Arkansas Franchise Practices Act**
**(On behalf of Arkansas Franchisees. against Choice)**

578.   Plaintiffs repeat and reallege each of the following paragraphs of the Complaint as if set forth at length herein.

579.   Arkansas Franchisees are., by the terms of their Franchise Agreements, required to perform business within the State of Michigan.

580.   Under the Arkansas Franchise Practices Act Arkansas Code § 4-72-206 and -207, a franchisor is prohibited, in connection with any purchase or sale of a franchise, from *inter alia*:

(a)   Requiring "a franchisee at the time of entering into a franchisee agreement to assent to a release, assignment, novation, waiver, or estoppel which would relieve any person from liability imposed by this subchapter";

(b)   Prohibiting "directly or indirectly the right of free association among franchisees for any lawful purpose";

(c)   Refusing "to deal with a franchise in a commercially reasonable manner and in good faith;"

(d)     Collecting "a percentage of the franchisee's sales as an advertising fee and not us[ing] these funds for the purpose of advertising the business conducted by the franchisee" and

(e)     Employing "any device, scheme, or artifice to defraud."

581.   As alleged above, Choice acted fraudulently, and made untrue statements of material fact and omitted material facts that, in their absence, made statements misleading, by making to Mahamati Inc. the following false representations:

(a)     That CHOC, to whom Arkansas Franchisees. owed monthly association fees, would represent and advance the mutual interests of Choice and Arkansas Franchisees, when Choice knew that CHOC did not represent the interests of Arkansas Franchisees;

(b)     That Choice would restrict the number of Qualified Vendors only to secure a group discount or to ensure adequate quality and supplies to its franchises, when Choice intended to restrict the number of Qualified Vendors for the primary purpose of securing kickbacks from the Qualified Vendors.

582.   Additionally, Choice has made a false representation to Arkansas Franchisees on each and every time occasion it billed Arkansas Franchisees for an association fee, when in fact it was aware that CHOC did not represent the interests of Arkansas Franchisees.

583.   Additionally, on occasions uniquely in Choice's knowledge, on information and belief Choice falsely represented to Arkansas Franchisees. that it had obtained a discount on Arkansas Franchisee.'s behalf from Qualified Vendors, and that it was thus entitled to withdraw monies from a marketing fund created by Arkansas Franchisees ., when in fact, Choice had obtained no discount, and in fact received a rebate from Qualified Vendors for the transaction,

which resulted in Arkansas Franchisees and Franchisees paying inflated prices for the Necessary Products.

584.    Additionally, Choice represents to Arkansas Franchisees that it will provide certain services, including access to its reservation system, in exchange for payment of the Systems Fee, but in fact charged them additional fees for access to those services.

585.    Choices representations and omissions were false, and Choice was aware of their falsity at the time they were made.

586.    Arkansas Franchisees did not know these representations and omissions were false, and acted on reasonable reliance of them. .

587.    Additionally, Choice has required Arkansas Franchisees to agree to Maryland choice of law, agree to mandatory arbitration, and agree to a class action waiver.

588.    As alleged above, Choice has further forced Arkansas Franchisees to contribute to a marketing fund but has not provided adequate marketing services and, on information and belief, has not used the earmarked funds for marketing.

589.    Finally, by corrupting the CHOC, Choice has invaded on the rights of Arkansas Franchisees to freely associate.

590.    As a direct and proximate result of Choice's actions, Arkansas franchisees. has suffered damages.

591.    WHEREFORE, Plaintiff requests that this Court: enter judgment in Franchisees and Mahamati Inc.'s favor against Choice for damages in an amount to be determined at trial; treble damages; and for reasonable attorney's fees and court costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a)  Enter an order against Choice and CHOC in favor of all Plaintiffs for actual damages; treble damages; and reasonable attorney's fees arising out of Choice and CHOC's violations of the RICO Act;

b)  Enter an order against Choice in favor of all Plaintiffs for actual damages; treble damages; and reasonable attorney's fees arising out of Choice's individual violations of the RICO Act;

c)  Enter an order against Choice in favor of all Plaintiffs, and also specifically the Marketing Franchisees, (1) for consequential and/or compensatory damages, and specific performance of the Agreements; or, in the alternative (2) for consequential and/or compensatory damages, and termination of the Agreement;

d)  Enter an order against Choice in favor of all Plaintiffs for actual damages and treble damages, and reasonable attorney's fees arising out of Choice's violations of the Sherman Act;

e)  Enter an order against CHOC in favor of all Plaintiffs for compensatory damages and punitive damages arising out of CHOC's breach of fiduciary duty;

f)  Enter an order against Choice and CHOC in favor of all Plaintiffs for compensatory damages, punitive damages, and reasonable attorney's fees arising out of Choice and CHOC's violations of the Civil Rights Act;

g)  Enter an order against Choice and in favor of New Jersey Franchisees for actual damages and reasonable attorney's fees arising out of Choice's violation of New Jersey statute;

h)  Enter a permanent injunction prohibiting Choice from continuing to perform acts in violation of the New Jersey Franchise Practices Act;

i)  Enter an order against Choice and in favor of New York Franchisees for actual damages, damages with interest at 6% per year from the date of purchase, and reasonable attorney's fees and court costs arising out of Choice's violation of New York statute;

j)  Enter an order against Choice in favor of judgment in Florida franchisees for all monies invested into the franchise, and for reasonable attorney's fees and court costs arising out of Choice's violation of Florida statute;

k)  Enter an order against Choice in favor of all Plaintiffs, and specifically Maryland Franchisees, for damages, restitution, and reasonable attorney's fees and court courts, and in the alternative to rescind the Franchise Agreements, arising out of Choice's violation of Maryland statute;

l)  Enter an order against Choice in favor of Mahamati Inc. for damages and 12% annual interest upon damages, and reasonable attorney's fees and court costs, arising out of Choice's violation of Michigan statute;

m) Enter an order against Choice in favor of DC Hotel LLC's for damages, reasonable attorney's fees, and court costs, arising out of Choice's violation of Minnesota statute;

n) Enter an order against Choice in Highmark Lodging LLC's favor for damages, reasonable attorney's fees, and court costs, arising out of Choice's violation of North Dakota statute;

o) Declare that the Unconscionable Provisions of the Agreements, specified above, are unconscionable illusory, and/or unenforceable against Plaintiffs;

p) Enter an order against Choice and CHOC in favor of all Plaintiffs entitling Plaintiffs to an accounting of all fees paid by them to CHOC and Choice, and all rebate payments made to Choice by Qualified Vendors;

q) Enter a permanent injunction prohibiting Choice's unlawful tying conduct;

r) Enter a permanent injunction prohibiting Choice and CHOC's unlawful discriminatory conduct.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues properly so tried.

WHITE AND WILLIAMS LLP

BY:   /s/ Justin E. Proper
          Justin E. Proper
          William H. Fedullo
          1650 Market Street | One Liberty Place,
          Suite 1800 |
          Philadelphia, PA 19103-7395
          Phone: 215.864.7165
          Attorneys for Plaintiffs

Dated:  July 15, 2020

## **CERTIFICATE OF SERVICE**

I, William H. Fedullo Esquire, hereby certify that on this 16th day of July, 2020, I caused a true and correct copy of the foregoing First Amended Complaint to be filed electronically and served upon all counsel of record via the Court's ECF System, and on unrepresented parties by first class mail.

By:/s/William H. Fedullo